# ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------------------x

**Ibrahim Annan Muslim**
**MOORISH AMERICAN MOOR SUI JURIS**
**800 VICTORY BLVD # 3V**
**STATEN ISLAND NEW YORK 10301**

## CV 12 - 2702

Plaintiff,    **COMPLAINT**
Jury Trial Remanded

**AMON, CH.J.**

**POLLAK, M.J**

-Against-
CITY OF NEW YORK POLICE DEPARTMENT,ED MALDONADO aka EDWARD, aka
EDDIE MALDONADO, DETECTIVES, OFFICERS, AGENTS: Bert Grant, James
Rose, Alback, and POLICE COMMISSIONER RAYMOND W. KELLY, MAYOR
MICHAEL R. BLOOMBERG, MISSING PERSONS DIVISION OR WHOEVER IS
RESPONSIBLE FOR PAYMENT TO IBRAHIM ANNAN SUI JURIS

**Defendants.**

--------------------------------------------------------------------------------------------
        x

I.  Parties:
Plaintiff, Ibrahim Annan, resides at 800 Victory Blvd., #3V, Staten Island, NY 10301.
Defendant, Raymond W. Kelly,resides at 1 Police Plaza, NY, NY 10038-1497.
Defendant, Eddie Maldonado, resides at 1 Police Plaza, NY, NY 10038-1497.
Missing Person's Unit 2770 Frederick Douglass Blvd.
Defendant, Bert Grant, resides at 1 Police Plaza, NY, NY 10038-1497.
Missing Person's Unit 2770 Frederick Douglass Blvd.
Defendant, James Rose, resides at 1 Police Plaza, NY, NY 10038-1497.
Missing Person's Unit 2770 Frederick Douglass Blvd.
Defendant, Mayor Michael R. Bloomberg, resides at City Hall, NY, NY 10039.
Defendant, Albeck/Alback, resides at 1 Police Plaza, NY, NY 10038-1497.

II.  The jurisdiction of the Court is invoked pursuant to_____.

III. Statement of Claim. {give a clear and concise statement of facts: where the claim arose, the
        date of each relevant event, a description of what occurred and how each defendant
        named was involved in the claim}

IV.    Remedy. State what relief, such as money damages you seek from each defendant

Date 5/29/2012  Sign without prejudice UCC 1-303
UCC 1-308 Ibrahim annan UCC 1-103.6  NOTARY _Diane Mule_
Sworn to before me on May 29 2012

Phone Number_____

RECEIVED
MAY 29 2012
PRO SE OFFICE

DIANE MULE
Notary Public, State Of New York
No. 04MU6080480
Qualified In Richmond County
Commission Expires September 16, 20 11

1

On January 23, 2010, Patrick Alford went missing. The child's mother, Jennifer Rodriguez, had been detained by the NEW YORK CITY POLICE DEPARTMENT. The child's aunt, Melissa Ortiz, asked me to give her, her mother, and her aunt Brenda, a ride to the 75 precinct in Brooklyn. She asked me to take her there because the police had her sister, Jennifer Rodriguez.

I drove Melissa and her family to the precinct so they could see what the situation was. We got there around 2 or 3 pm. I let Melissa, and her family out while I was in Brooklyn. I was putting up missing posters/fliers when I received a call from Melissa saying come back to the precinct. When I arrived back to the precinct Melissa, and her family were with a group of detectives. They asked me who I was. I told them I was a friend of the family. Melissa then told me that they were unable to have contact with Jennifer. And they heard her screaming that she wanted to go home. This was about 6pm.

A group of investigators, officers, or detectives from the 75th pct., and the CITY OF NEW YORK POLICE DEPARTENT assured and promised me, Ibrahim Annan, and the family of Jennifer Rodriguez, the woman being interrogated, that they would give her a ride home at around 9 or 10 pm. Again, agents, detectives, operatives, of the CITY OF NEW YORK POLICE DEPARTMENT promised to give Jennifer Rodriguez a ride home from Brooklyn, back to Staten Island where she lived when they were finished questioning her. They did not keep their promise.

Subsequently, Melissa Ortiz and her sister, Jennifer Rodriguez, started calling me, Ibrahim Annan, to pick them up. Melissa Ortiz stayed with her sister because Jennifer Rodriguez family heard her screaming that she wanted to go home. This was around 1pm, January 23, 2010. The police would not give them a ride back home at 1am.

When I returned to the 75th precinct in East New York, Brooklyn, about fifteen to twenty miles away from my home, I, Ibrahim Annan,

4

went inside the 75th precinct to ask the receiving officers at the front

desk to please send Melissa Ortiz, and her sister, Jennifer Rodriguez,

outside. Their ride home had arrived all the way from Staten Island. A

Detective or Investigator named *Alback or Albeck* came outside and

told me to "get the fuck inside."

Under threat duress, and coercion, and under command to go inside

the 75th pct, I obliged. Detective *Albeck* or *Alback* questioned me for

about 15 to 20 minutes. He asked me if I was Muslim. He asked me if

I was converting people to Islam. This has nothing to do with the

matter at hand. The matter at hand was the disappearance of Patrick

Alford. This is a matter Ibrahim Annan knows nothing of. This is also

the United States. We have freedom of religion...so I thought.

Before leaving the 75th precinct that night, Detective *Albeck or*

*Alback* , tried to demand and order that I, Ibrahim Annan, bring

Melissa Ortiz and Jennifer Rodriguez back to Brooklyn for more

questioning the next day. I told him this was his job. He said he knew

the women had some personal matters to attend to so after they did

5

what they had to do he needed them back. I, Ibrahim Annan, said no to him because the CITY OF NEW YORK POLICE DEPARTMENT promised to bring them back to Staten Island in front of me, and their mother, aunt, uncle, and more family. This did not happen. The women were there at the 75th precinct for more than twelve hours. I, Ibrahim Annan, thought that when I had given Melissa Ortiz, her mother, and her aunt a ride to the precinct that I would drop them and go home. This did not happen. I gave support to a friend, and stayed a few hours with them, and other family members until the CITY OF NEW YORK POLICE DEPARTMENT promised to give Jennifer Rodriguez a ride home before my eyes.

It was a broken promise it has turned out to be two (2) years of harassment, hell, and terror. The headaches the stress, and mind altering strain of the bad dreams of police possibly beating, killing or even kidnapping me have been ongoing. This situation has also destroyed my relationship with someone I really cared deeply about. Anyway, I took the women home back to Staten Island.

The next day, I helped Melissa Ortiz to go to the court house on Staten Island. As I was in transit, Detective *Albeck or Alback* was on the phone being very nasty with Melissa Ortiz. She passed me the phone. Detective *Albeck or Alback* of the CITY OF NEW YORK POLICE DEPARTMENT said over the phone "bring those fucking bitches to me now." I hung up the phone, and dropped them at the Court House in Staten Island where the CITY OF NEW YORK POLICE DETECTIVES met, and received them.

About fifteen minutes after dropping Melissa Ortiz at the Court house, I received a call from my sister telling me that some detectives were at my door trying to push their way into my home on January 24, 2010. My sister said they came to the door asking: "Is there a little boy in there? I think I hear a child." There was no child. They also threatened: "You don't want us to bring the dogs." They also asked: "Is there a body in the house?" Listening to the piracy, conspiracy, human trafficking, threat, duress, and coercion, due process violation, emotional trauma, emotional distress, deceptive practice, and continued harassment, and terrorism.

7

The usually quiet Silver Lake park area has no longer been a pleasant place for months. The Defamation of my character and being has been traumatic and emotional. It has been a detrimental experience. **Ibrahim Annan has not rested well or slept well since the start of this terror.**

On January 27, 2010, I walked to my building with an attorney on the phone. His name: Manny Ortega. (According to my phone records, he was on the phone for twelve (12) minutes. From 7:04 pm, until 7:16 pm.) During that time, Detective James Rose seized me, searched me and found nothing. Put me in the car with Manny Ortega still on the phone listening to me tell them that I did not want to go anywhere with them. That I had done nothing wrong, and that they were kidnapping me. And that they were violating my rights.

After placing me in the car, Detectives asked me about my prior criminal history. I told them this was not the matter at hand and that I wanted to get out of the car. Detective ignored my request and began driving.

8

Mr. Manny Ortega and I were then disconnected because detectives took my phone. They told me I could not call him back. I wanted to keep him included in the interrogation and be witness to my unlawful confinement/false imprisonment.

**Detectives searched me one more time before getting to the 75th pct, where I was given a *show up/line up*. Meaning some woman who I had never seen before came out and walked over to me. She then said, in front of the whole 75th pct., detective squad: "No. Not him. I have never seen this man before."**

**I wanted to faint. I wanted to go home. But the criminal behavior did not end. I told detectives that I wanted to go home more than a few times. Each time I was told: "No." Or: "You will leave when we tell you to leave." Or: "When we're finished with you."**

**From there, Detectives brought me to a room where they belittled me. They asked questions that did not pertain to the matter at hand. They asked questions like "Is the baby in Melissa Ortiz stomach yours? Is she your girlfriend?" I told them I was brought**

here to be questioned about Patrick Alford. Please ask Melissa Ortiz these questions. The matter at hand was not the sexual relations between Melissa Ortiz and Ibrahim Annan. The matter at hand was the disappearance of Patrick Alford. This is a true personal right violation.

I did not call Mellissa Ortiz my *girlfriend*. I called her my *good friend*. Detective Grant did not like this. He demanded that I call Melissa Ortiz my girlfriend. I told him this was none of his business. I recall asking if could I go home. This is not the matter at hand. Detective Grant said "You will go when we say so."

My personal relation with this woman was not this man's business. Detective Grant then called me a "baby fucker."

This has caused a great deal of emotional distress, and anxiety, and defamation of character.

There was another moment during the questioning when detective Albeck or Alback asked "What? Are you into old ladies?"

I was shocked. I did not know what he meant.

New York City Police Detectives Bert Grant, and James Rose had Ibrahim Annan in their custody for at least four and a half hours.

Ibrahim Annan has told detectives from the start of this ordeal, January 23rd 2010, that he knows nothing about this matter. I was told the night of the 23rd, and the night of the 27th, that I would not be questioned again. That a line would be drawn through my name, effectively crossing me off their list. This was a lie.

On many occasions before May 12, 2010 there was another detective named Ed Maldonado who harassed me. I do not remember the exact dates. Ibrahim Annan demands that his statements and/or reports be produced. 18 U.S.C. § 3500

On May 12, 2011, my family called my phone telling me to come home. That Detective Bert Grant and Detective James Rose were at my door looking for me. They wanted me to go with them. I told my family to tell them that I was not going anywhere with

anybody.  The Detectives kept telling my family that I had to go with them.  That they were not leaving until I showed up at home.

So being afraid of being kidnapped by the police again, I called Mr. Christopher Gittens, and Mr. Timothy Hampton to help me go and see what was going on at my home.  My attorney, Manny Ortega, had already told me that I did not have to say anything to anyone or go anywhere.

We proceeded to my home.  As we were pulling up to the building, the Detectives in question were pulling out.  I told my friend Timothy Hampton, who was driving, to go their direction.  We found the police at Cebra Avenue and Victory Blvd.  Mr. Hampton pulled over.

Christopher Gittens and I got out and walked over to Detective Grant. I said to him: "Hello Detective Grant.  Are you looking for me?"  He responded that they needed me to take a test a lie detector test.  I told him that I object.  I told them no before.  I was advised by counsel that I did not have to do so.

Mr. Christopher Gittens then kindly asked them why they were telling me that I had to take a test I did not have to take. Mr. Christopher Gittens was on the phone with a police officer, who was his friend. He was advising him.

1. Timothy Hampton, Christopher Gittens, and Ibrahim Annan then left the area in the private property of Timothy Hampton: his car exercising our right to Life Liberty, and our pursuit of Happiness.

After perusing us and pulling us over, Detective James Rose opened the passenger door of the car and demanded that Christopher Gittens get out. Christopher Gittens kindly responded by saying that he was a traveler, and to please deal with the driver. Christopher Gittens' seatbelt was then unlocked by Detective James Rose. Detectives then dragged Christopher Gittens out of the car and savagely beat the man.

Ibrahim Annan recorded the incident from beginning to end

from the backseat of Timothy Hampton's car. Detective Grant then demanded Ibrahim Annan personal private property and eased Ibrahim Annan invaluable, intangible, tangible intellectual property/creation.

Sprint Telephone recovered the deleted files which show the time and date in question. Also the date and the time the Crime happened. Meaning the duration of time we were held against our will.

Charges are substantiated by the CIVILIAN COMPLAINT REVIEW BOARD  Re: CCRB case number 201106429 CIVILIAN COMPLAINT REVIEW BOARD 40 Rector Street, 2nd Floor New York, New York 10006 /Telephone (212) 442-8833 w.w.w.nyc.gov/ccrb

Detectives Bert Grant and James Rose clearly demonstrated negligent or wrongful act or omission while on the clock of the taxpayer. They acted outside the scope of their office or employment. Obstructing, and Hindering the right to travel, and a man's right to life liberty, and pursuit of happiness. Use of physical

14

force against Christopher Gittens has caused emotional trauma and emotional distress to Ibrahim Annan.

Ibrahim Annan Has Not Slept well Or Rested Well since the start of this ordeal there has been a chain of events which started 1/23/2010. Substantiated Charges CCRB, Case number 201106429 ---ABUSE OF AUTHORITY DETECTIVE Grant Searched the property of Ibrahim Annan, and Christopher Gittens / DETECTIVE James Rose Used PHYSICAL FORCE Against Christopher Gittens./Case number 201106429.

The remedy and relief shall be $250,000,000.00. Whereas the remedy, and relief for Christopher Gittens, who has sustained multiple blunt trauma as a result of excessive physical force shall be $500,000.000.00. Whereas the remedy Recourse, and relief for The three men in the car Timothy Hampton, Christopher Gittens, Ibrahim Annan.

Would like their violation of liberty fee schedules imposed. Two hundred and fifty thousand dollars ($250,000) for every fifteen (15)

15

minutes or any part thereof The CITY OF NEW YORK POLICE DEPARTMENT detectives Bert Grant, and James Rose pulled us over, and made us wait in the car for at least ten to fifteen minutes before even approaching the car.  When they approached the car Christopher Gittens was beaten bloody, and handcuffed.  He was told to sit against the wall me and Timothy Hampton were ordered to sit back in Timothy Hampton's car where we sat for at least an hour and ten minutes.

The fee schedule amount $500,000.00 for Special Appearance plus the violation of Liberty fee schedule for $250,000.00 + $750.000.00 dollars for the first fifteen minutes.

Ibrahim Annan wishes the remedy recourse, and relief for fee schedule violations for the day of MAY 12, 2010 to be $2,500,000.00 (two and half million dollars) per individual.

- **The jurisdiction of the Court is invoked pursuant to Right to inform federal Officials of violations of federal Laws is within broad protection of this section proscribing**

16

conspiracy to violate Civil Right's <u>U.S. v. Smith</u>,

Ca.9(Cal.)1980,623 F.2d 627.

On Saturday, January, 21, 2012, Ed Maldonado received a

Notice of sovereign authority which stated that it cost you

$250,000.00 for every fifteen minutes of my time.

You came to my home unannounced. You were informed

about the fees expressed herein. The jurisdiction of the Court

is invoked pursuant to U.S.C. § 1514 Civil action to enjoin the

obstruction of justice. You, Ed Maldonado, held the two notices

totaling $750,000.00 dollars in your hand. You, and the new

officer that was with you the day of January 21, 2012.

The jurisdiction of the Court is invoked pursuant to 28 USC §

Perjury Cases 1760- 28 U.S.C. § ---1746. Unsworn Declarations.

You Ed Maldonado, CITY OF NEW YORK POLICE

Department were notified by text message to your phone. On

Monday, January, 22, 2012 at 1:42 pm, and again on, January

23, 2012, Monday, February 20, 2012 at 1:07 pm and at 4:03

17

pm about your violations of January 21, 2012,. The jurisdiction of the Court is invoked pursuant to title 18 U.S.C. § 3486.

I have told you, I do not know anything about the matter you are investigating. But you continue to harass me. Detective Eddie Maldonado came to my home to call me, Ibrahim Annan, Sui Generis, a liar.

Ibrahim Annan, Sui Generis, Sui Juris, would like the remedy recourse, and relief to be $13,000,000,00 dollars for the crimes of Ed Maldonado.

Detective Ed Maldonado came to my door with another heavy set officer to speak loudly in my hallway to say that they had spoken to Amaris Perez. The detective told me Amaris Perez had told them she did not know me. Ibrahim Annan does not accept this defamation/slander. I immediately told him he was lying.

I told the detectives hold on one minute went to my room and

got a empty prescription bottle which contained Amaris Perez name on the bottle. Amaris Perez had given me the bottle just in case the police would give me any problems. Amaris Perez is also my friend on facebook. At this time in my life Amaris Perez was not a friend of mine on facebook. Today's date March 21, 2012.

The jurisdiction of the Court is invoked pursuant to 28 USC § 2679 Exclusiveness of Remedy (B) which is brought for a violation of a statute of the United States for injury or loss of property or personal removal under § 2679 of title 28 United States Code.

Eddie Maldonado took my proof and left. Before they left they wanted to know how I met Amaris Perez. This is none of there business. They are looking for Patrick Alford.

The night I was abducted and taken to the 75th pct. by Detective Rose and grant, and given an illegal show up/lineup, and questioned. Detectives asked me where I was. I told them I

was with Amaris Perez, who resides at 124 Lafayette street Staten Island, New York.

At that period in time, in the interrogation room, I could not remember her exact address. I had just met the women, now she is my friend on facebook.

You are in violation of seven minutes of my time please send me an address so you can be billed you will also be billed for your previous violations you are receiving the bill for January 21, 2012.

Ibrahim Annan wishes the remedy recourse, and relief for Ed Maldonado crimes to be $13,000,000,000. The jurisdiction of the Court is invoked pursuant ----<u>Hale v. Henkel</u>, § 201 U.S.43(1905)-96.

Your amount due is $13,000,000.00, Mr. Maldonado.

Since the start of this ordeal no one has presented a warrant signed by a Federal Judge or any delegation of authority orders from a police department or any agency/corporation. To go anywhere. Piracy, conspiracy, deceptive practice, and much more has happened.

## THE JURISDICTION OF THE COURT

*.1    1)  The jurisdiction of the Court is invoked pursuant to 18 USC 73 Obstruction of Justice § 1506. {Preventing the disclosure of accurate information} On April 12, 2010 Timothy Hampton, Christopher Gittens, and Ibrahim Annan were in the private property of Timothy Hampton. "His car" exercising their right to Life Liberty, and their pursuit of Happiness. Detective James Rose opened the passenger door asked Christopher Gittens to get out. Christopher Gittens kindly responded by saying that he was a traveler, and to please deal with the driver. Christopher Gittens seatbelt was unlocked by detectives, then detectives dragged Christopher Gittens out of the car to savagely beat the man. Ibrahim Annan recorded the incident from beginning to end in Timothy Hampton's car. The jurisdiction of the Court is invoked pursuant to 28 United States Code § 2679 –Exclusiveness of Remedy (B) which is brought for a violation of a statute of the United States for injury or loss of Property or Personal Removal under § 2679 of Title 28 USC (Detective Grant Demanded Ibrahim Annan Personal Private Property to Erase Ibrahim Annan Invaluable intangible, tangible intellectual property. Creation Sprint Telephone Recovered the Deleted Files Which Show The time and Date of The time, and date of the time the Crime happened meaning the duration of time we were held against our will. The jurisdiction of the Court is invoked pursuant to title 18 U.S.C. 73 § 1514 Civil action to enjoin the (Obstruction of Justice). (Charges) are substantiated by the CIVILIAN COMPLAINT REVIEW BOARD   Re: CCRB case number 201106429 CIVILIAN COMPLAINT REVIEW BOARD 40 Rector Street, 2nd Floor New York, New York 10006 /Telephone (212) 442-8833 w.w.w.nyc.gov/ccrb Ibrahim Annan wishes remedy, recourse, and relief to be $250,000,000.00, dollars for this violation day. The jurisdiction of the Court is invoked pursuant to False Imprisonment, "Heath v. Boyd, 175 S.W. 2.d.217 (1943); Brock v. Stimson, 108 Mass. 520 (1871). Detective Bert Grant, and James rose clearly demonstrated negligent or wrongful act or omission while on the clock of the taxpayer.  They acted outside the scope of their office or employment. Obstructing, and Hindering the right to travel, and a man's right to life liberty, and pursuit of happiness.  Use of physical force against Christopher Gittens has Caused Emotional Trauma, and Emotional Distress to Ibrahim*

*Annan. Ibrahim Annan Has Not Slept well Or Rested Well since the start of this ordeal there has been a chain of events which started 1/23/2010. Substantiated Charges CCRB, Case number 201106429 ---ABUSE OF AUTHORITY DETECTIVE Grant Searched the property of Ibrahim Annan and Christopher Gittens. DETECTIVE James Rose Used PHYSICAL FORCE Against Christopher Gittens. Case number 201106429. The remedy, and relief shall be $250,000,000.00. Whereas the remedy, and relief for Christopher Gittens, who has sustained multiple blunt trauma as a result of excessive physical force shall be $500,000.000.00.Whereas the remedy Recourse, and relief for The three men in the car Timothy Hampton, Christopher Gittens, Ibrahim Annan. Would like their violation of liberty fee schedules imposed. Two hundred and fifty thousand dollars for every fifteen minutes or any part thereof The CITY OF NEW YORK POLICE DEPARTMENT detectives Bert Grant, and James Rose pulled us over, and made us wait in the car for at least ten to fifteen minutes before even approaching the car When they approached the car Christopher Gittens was beaten bloody, and handcuffed. He was told to sit against the wall me and Timothy Hampton were ordered to sit back in Timothy Hamptons car where we sat for at least an hour, and ten minutes. The fee schedule amount $500,000.00 for Special Appearance plus the violation of Liberty fee schedule for $250,000.00 + $750.000.00 dollars for the first fifteen minutes. Ibrahim Annan wishes the remedy recourse, and relief for fee schedule violations for the day of MAY 12/2010 to be $2,500,000.00 two and half million dollars per individual.*

*Improper use of authority by someone who has that authority because he or she holds a public office.*

Abuse of power is different from usurpation of power, which is an exercise of authority that the offender does not actually have.

"The one arresting has "a duty to immediately see a magistrate," and failure to do so "makes a case of false Imprisonment." Heath v. Boyd, 175 S.W. 2d. 217(1943); Brock v. Stimson, 108 Mass. 520 (1871)

The jurisdiction is invoked pursuant to 18 U.S.C. 18 § 3498.-Time, manner and conditions of taking depositions; costs; notice; use; objections; written interrogatories, Rule 15.

The jurisdiction is invoked pursuant to 18 USC § 3500 – Demands for Production of Statements and reports.

"To detain the person arrested in custody for any purpose other than that of taking him to a magistrate is illegal." <u>Kominsky v. Durand</u> 12 Atl. 2d. 645 (1940)

"The power to arrest does not confer upon the arresting officer the power to detain a prisoner for other purposes." <u>Geldon v. Finnegan</u>, 252 N.W. 372 (1934) <u>State v. Gum</u>, 69 S.E. 464 ( 1910).

[🖉]West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

(2) The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice § 1506.{Theft or alteration of record or process}.
*Improper use of authority by someone who has that authority because he or she holds a public office.* . While deleting the invaluable intellectual personal property of Ibrahim Annan the detectives recorded themselves by accident committing the crime.

Abuse of power is different from usurpation of power, which is an exercise of authority that the offender does not actually have.

[🖉]West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

(3) The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice § 1510. {Obstruction of a Criminal Investigation}*Improper use of authority by someone who has that authority because he or she holds a public office.*
Abuse of power is different from usurpation of power, which is an exercise of authority that the offender does not actually have. . While deleting the invaluable intellectual personal property of Ibrahim Annan the detectives  recorded themselves by accident committing the crime.

[🖉]West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

(4) The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice § 1511. {Obstruction of State or Local Law enforcement}Bullying-{<u>badger</u>, <u>browbeat</u>, <u>brutalize</u>, <u>endanger</u>, <u>frighten</u>, <u>harass</u>, <u>harrow</u>, <u>harry</u>, <u>hector</u>, <u>intimidate</u>, <u>irritate</u>, <u>mistreat</u>, <u>persecute</u>, <u>pique</u>} [🖉]

(5)The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice §1512. {Tampering with a witness, victim Ibrahim Annan Invaluable Camera footage that was Tampered with on 5/12/2011. While deleting the invaluable intellectual personal property of Ibrahim Annan the detectives recorded themselves by accident committing the crime. These men are in violation of U.C.C. 1-308, U.C.C. 1-303.

.2     923     .3     **18 U.S.C. § 371—Conspiracy to Defraud the United States**

The general conspiracy statute, 18 U.S.C. § 371, creates an offense "[i]f two or more persons conspire Either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose. (emphasis added). *See* Project, *Tenth Annual Survey of White Collar Crime*, 32 Am. Crim. L. Rev. 137, 379-406 (1995)(generally discussing § 371).

The operative language is the so-called "defraud clause," that prohibits conspiracies to defraud the United States. This clause creates a separate offense from the "offense clause" in Section 371. Both Offenses require the traditional elements of Section 371 conspiracy, including an illegal agreement, criminal intent, and proof of an overt act.

Although this language is very broad, cases rely heavily on the definition of "defraud" provided by the Supreme Court in two early cases, *Hass v. Henkel*, 216 U.S. 462 (1910), and *Hammerschmidt vs. United States*, 265 U.S. 182 (1924). In *Hass* the Court stated:

The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government . . . (A)ny conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operation and reports as fair, impartial and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquire the way and at the time required by law or departmental regulation.
*Hass*, 216 U.S. at 479-480. In *Hammerschmidt*, Chief Justice Taft, defined "defraud" as follows:
To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention.
*Hammerschmidt*, 265 U.S. at 188.
The general purpose of this part of the statute is to protect governmental functions from frustration and distortion through deceptive practices. Section 371 reaches "any conspiracy for the purpose of impairing obstructing or defeating the lawful function of any department of Government."
*Tanner v. United States*, 483 U.S. 107, 128 (1987); *see Dennis v. United States*, 384 U.S. 855 (1966).
The "defraud part of section 371 criminalizes any willful impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute."
*United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).
The word "defraud" in Section 371 not only reaches financial or property loss through use of a scheme or artifice to defraud but also is designed and intended to protect the integrity of the United States and its agencies, programs and policies. *United States v. Burgin*, 621 F.2d 1352, 1356 (5th Cir.), *cert. denied*, 449 U.S. 1015 (1980); *see United States v. Herron*, 825 F.2d 50, 57-58 (5th Cir.);
*United States v. Winkle*, 587 F.2d 705, 708 (5th Cir. 1979), *cert. denied*, 444 U.S. 827 (1979).

Thus, proof that the United States has been defrauded under this statute does not require any showing of monetary or proprietary loss. *United States v. Conover*, 772 F.2d 765 (11th Cir. 1985), *aff'd, sub. nom. Tanner v. United States*, 483 U.S. 107 (1987); *United States v. Del Toro*, 513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826 (1975); *United States v. Jacobs*, 475 F.2d 270 (2d Cir.), *cert. denied*, 414 U.S. 821 (1973).

Thus, if the defendant and others have engaged in dishonest practices in connection with a program administered by an agency of the Government, it constitutes a fraud on the United States under

Section 371. *United States v. Gallup*, 812 F.2d 1271, 1276 (10th Cir. 1987); *Conover*, 772 F.2d at 771.

In *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990), the defendants' actions in disguising contribut were designed to evade the Federal Election Commission's reporting requirements and constituted fraud the agency under Section 371.

The intent required for a conspiracy to defraud the government is that the defendant possessed The intent (a) to defraud, (b) to make false statements or representations to the government or it's agencies in order to obtain property of the government, or that the defendant performed acts or made statements that he/she knew to be false, fraudulent or deceitful to a government agency, which disrupted the functions of the agency or of the government. It is sufficient for the government to prove that the defendant knew the statements were false or fraudulent when made. The government is not required to prove the statements ultimately resulted in any actual loss to the government of any property or funds, only that the defendant's activities impeded or interfered with legitimate governmental functions. *See United States v. Puerto*, 730 F.2d 627 (11th Cir.), *cert. denied*, 469 U.S. 847 (1984);

*United States v. Tuohey*, 867 F.2d 534 (9th Cir. 1989); *United States v. Sprecher*, 783 F. Supp. 133, 156 (S.D.N.Y. 1992)(þit is sufficient that the defendant engaged in acts that interfered with or obstructed a lawful governmental function by deceit, craft, trickery or by means that were dishonest"), *modified on other grounds*, 988 F.2d 318 (2d Cir. 1993).

In *United States v. Madeoy*, 912 F.2d 1486 (D.C. Cir. 1990), *cert. denied*, 498 U.S. 1105 (1991), the defendants were convicted of conspiracy to defraud the government and other offenses in connection with a scheme to fraudulently obtain loan commitments from the Federal Housing Administration (FHA) or Veterans Administration (VA). The court held that the district court had proper instructed the jury that:
the Government must prove beyond a reasonable doubt the existence of a scheme or artifice to defraud, the objective either of defrauding the FHA or the VA of their lawful right to conduct their business and affairs free from deceit, fraud or misrepresentation, or of obtaining money and property from the FHA b means of
false and fraudulent representations and promises which the defendant knew to be false. *Madeoy*, 912 ł at 1492. Prosecutors considering charges under the defraud prong of Section 371, and the offense prong

of Section 371 should be aware of *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989) holding limited, 985 F.2d 962 (1993), and related cases. *See United States v. Arch Trading Company*, 987 F.2d 1087 (4th Cir. 1993). In *Minarik*, the prosecution was found to have "used the defraud clause in a way that created great confusion about the conduct claimed to be illegal," and the conviction reversed. 875 F.2d at 1196. After *Minarik*, defendants have frequently challenged indictments charging violations
of both clauses, although many United States Courts of Appeals have found it permissible to invoke both clauses of Section 371. *Arch Trading Company*, 987 F.2d at 1092 (collecting cases); *see also United States v. Licciardi*, 30 F.3d 1127, 1132-33 (9th Cir. 1994)(even though the defendant may have impaired a government agency's functions, as part of a scheme to defraud another party, the government offered no evidence that the defendant intended to defraud the United States and a conspiracy to violate an agency regulatory scheme could not lie on such facts).

In summary, those activities which courts have held defraud the United States under 18 U.S.C. § 371 affect the government in at least one of three ways:
1. They cheat the government out of money or property;
2. They interfere or obstruct legitimate Government activity; or
3. They make wrongful use of a governmental instrumentality.
[cited in USAM 9-42.001]

**.4**

**.7**

    **(6) The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice § 1518. {Obstruction of criminal investigations of health care offences the beating of Christopher Gittens on 5/12/2011 filmed by Ibrahim Annan, and erased deleted files were recovered by sprint telephone technicians. While deleting the invaluable intellectual personal property of Ibrahim Annan the detectives recorded themselves by accident committing the crime. 18 U.S.C. § 3498, Title 18 USC § 3500.**

    **(7) The jurisdiction is invoked pursuant to 18 USC 73 Obstruction of Justice § 1505. {Obstruction of proceedings before department's, and agencies, and committees the destruction of Ibrahim Annan invaluable personal property**

    **(8) The jurisdiction is invoked pursuant to 28 USC § 1738 State and territorial statutes and judicial proceedings; Full Faith and credit. Ibrahim Annan affirms everything in this document is the truth.**

(9) The jurisdiction is invoked pursuant to 28 USC § Perjury Cases 1760- 28 U.S.C. §---1746. Unsworn Declarations.

(10) The jurisdiction is invoked pursuant to 18 § 241,Pg 734 (U.S. v. Lancaster, C.C.S.D. GA1891,44 F. 896  {27 specific 28 Coercion-U.S. v. Kozminski,U.S., mich 1988, 108 S.CT 2751.

(11)    The jurisdiction is invoked pursuant to 26 Intent Note 18 § 241 pg 737{U.S. v. Guest, U.S. v. Ga, 1966,86 S.Ct. 1170, 383 U.S. 745, 16 L.Ed.2d {U.S. v. Johnson, U.S. Ga. 1968, 88 S.ct 1291, 390 U.S. 563, 20 L. Ed.2d 132.

(12)    The jurisdiction is invoked pursuant to Right to inform federal Officials of violations of federal Laws is within broad protection of this section proscribing conspiracy to violate Civil Right's U.S. v. Smith, Ca.9(Cal.)1980, 623 F.2d 627. Detective Bert Grant tried to cover up crimes police committed by trying to erase the invaluable works off of his high definition video camera this was foiled because the phone company recovered the deleted files. While erasing the video the officers recorded themselves on my device by mistake without knowing. Ibrahim Annan respectfully wishes the Court to grant the remedy recourse ,and relief in the amount of two  hundred ,and fifty million dollars $250,000,000.00.

(13)    The jurisdiction is invoked pursuant to 47 USC § 223 -Obscene or harassing telephone calls in the District of Columbia or interstate or foreign communications. Every time Detectives, Officers, Agents, or employees of the City Of New York Police Department went to my home to Demand my family to call me on the phone, to just stop what I was doing. The Police had my phone number, and never attempted to call me Ibrahim Annan on the Phone. Every time the New York Police Department called, I Presented myself.

(14)    The jurisdiction is invoked pursuant to USC § 1514 Civil action to enjoin the obstruction of Justice

(15)    The jurisdiction is invoked pursuant to United States v. Olmstead, 277 U.S. 438(1928)

(16)    The jurisdiction is invoked pursuant to {actual malice}- Knowledge that the information was false.

(17)    The jurisdiction is invoked pursuant to {Gallegos v. Haggerty, Northern District of New York}, 689 F. Supp.93

(18)    The jurisdiction invoked pursuant to {Hatari v. Haya},751 F. Supp. 1401

(19)    The jurisdiction is invoked pursuant to {Title 18 U.S.C. § 2679} <u>Serra v. Pichardo</u>, 786 F.2d 237 (6Th Cir.)

(20)The jurisdiction is invoked pursuant to{<u>Tully v. Mott Supermarkets</u>, Inc, 337 F. Supp.(834), 844 D.N.J(1972)

(21)The jurisdiction is invoked pursuant to {42 USC § 1983 <u>Fonda v. Gray</u>, 1983 (Ca9) Cal 707 F.2d 235.) emotional distress n. an increasingly popular basis for a claim of damages in lawsuits for injury due to the negligence or intentional acts of another. Originally damages for emotional distress were only awardable in conjunction with damages for actual physical harm. Recently courts in many states, including New York and California, have recognized a right to an award of money damages for emotional distress without physical injury or contact. In sexual harassment claims, emotional distress can be the major, or even only, harmful result. In most jurisdictions, emotional distress cannot be claimed for breach of contract or other business activity, but can be alleged in cases of libel and slander. Evidentiary problems include the fact that such distress is easily feigned or exaggerated, and professional testimony by a therapist or psychiatrist may be required to validate the existence and depth of the distress and place a dollar value upon it. (See: <u>damages</u>) Copyright © 1981-2005 by <u>Gerald N. Hill and Kathleen T. Hill</u>. All Right reserved.

(22) The jurisdiction is invoked pursuant to---

Advertisement (Bad banner? Please <u>let us know</u>)    *Any intentional false communication, either written or spoken, that harms a person's reputation; decreases the respect, regard, or confidence in which a person is held; or induces disparaging, hostile, or disagreeable opinions or feelings against a person.*

Defamation may be a criminal or civil charge. It encompasses both written statements, known as LIBEL, and spoken statements, called slander. The probability that a plaintiff will recover damages in a defamation suit depends largely on whether the plaintiff is a public or private figure in the eyes of the law. The public figure law of defamation was first delineated in <u>NEW YORK TIMES V. SULLIVAN</u>, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). In *Sullivan*, the plaintiff, a police official, claimed that false allegations about him appeared in the *New York Times*, and sued the newspaper for libel. The Supreme Court balanced the plaintiff's interest in preserving his reputation against the public's interest in freedom of expression in the area of political debate. It held that a public official alleging libel must prove actual malice in order to recover damages. The Court declared that the <u>First Amendment</u> protects open and robust debate on public issues even when such debate includes "vehement, caustic, unpleasantly sharp attacks on government and public officials." A public official or other plaintiff who has voluntarily as-

sumed a position in the public eye must prove that defamatory statements were made with knowledge that they were false or with reckless disregard of whether they were false.

Where the plaintiff in a defamation action is a private citizen who is not in the public eye, the law extends a lesser degree of constitutional protection to defamatory statements. Public figures voluntarily place themselves in a position that invites close scrutiny, whereas private citizens who have not entered public life do not relinquish their interest in protecting their reputation. In addition, public figures have greater access to the means to publicly counteract false statements about them. For these reasons, a private citizen's reputation and privacy interests tend to outweigh free speech considerations and deserve greater protection from the courts. (See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 [1974]).

Distinguishing between public and private figures for the purposes of defamation law is sometimes difficult. For an individual to be considered a public figure in all situations, the person's name must be so familiar as to be a household word—for example, Michael Jordan. Because most people do not fit into that category of notoriety, the Court recognized the limited-purpose public figure, who is voluntarily injected into a public controversy and becomes a public figure for a limited range of issues. Limited-purpose public figures, like public figures, have at least temporary access to the means to counteract false statements about them. They also voluntarily place themselves in the public eye and consequently relinquish some of their privacy rights. For these reasons, false statements about limited-purpose public figures that relate to the public controversies in which those figures are involved are not considered defamatory unless they meet the actual-malice test set forth in *Sullivan*.

Determining who is a limited-purpose public figure can also be problematic. In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976), the Court held that the plaintiff, a prominent socialite involved in a scandalous <u>Divorce</u>, was not a public figure because her divorce was not a public controversy and because she had not voluntarily involved herself in a public controversy. The Court recognized that the divorce was newsworthy, but drew a distinction between matters of public interest and matters of public controversy. In *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979), the Court determined that a scientist whose federally supported research was ridiculed as wasteful by Senator William Proxmire was not a limited-purpose public figure because he had not sought public scrutiny in order to influence others on a matter of public controversy, and was not otherwise well-known.

Further readings

Collins, Matthew. 2001. *The Law of Defamation and the Internet.* New York: Oxford Univ. Press.

Friedman, Jessica R. 1995. "Defamation." *Fordham Law Review* 64 (December).

Jones, William K. 2003. *Insult to Injury: Libel, Slander, and Invasions of Privacy.* Boulder, Colo.: Univ. Press of Colorado.

Smolla, Rodney A. 1999. *Law of Defamation.* 2d ed. St. Paul, Minn.: West Group.

Cross-references

Freedom of the Press; Libel and Slander.

West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

■

defamation (of character) n. the act of making untrue statements about another which damages his/her reputation. If the defamatory statement is printed or broadcast over the media it is libel and, if only oral, it is slander. Public figures, including officeholders and candidates have to show that the defamation was made with malicious intent and was not just fair comment. Damages for slander may be limited to actual (special) damages unless there is malice. Some statements such as an accusation of having committed a crime, having a feared disease, or being unable to perform one's occupation are called libel per se or slander and can more easily lead to large money awards in court and even punitive damage recovery by the person harmed. Most states provide for a demand for a printed retraction of defamation and only allow a lawsuit if there is no such admission of error. (See: fair comment)

Copyright © 1981-2005 by Gerald N. Hill and Kathleen T. Hill. All Right reserved.

■

defamation *noun* abuse, aspersion, calumniation, calumny, denigration, derogation, detraction, disparagement, disrepute, false accusation, false publication, false report, imputation, infamy, insinuation, invective, libel, obloquy, scandal, slander, slur, smear, smirch, traducement, untruth

Associated concepts: defamation against title, defamation of business or profession, defamation of character, defamation per quod, defamation per se, defamatory publication, defamatory upon its face, defamatory words, injury to character or reputation, injury to profession or business

Foreign phrases: Inveniens libellum famosum et non corrumpens punitur.A person who finds a libel and does not destroy it is punished.

————

See also: aspersion, denunciation, dishonor, hatred, infamy, libel, malediction, obloquy, opprobrium, phillipic, scandal, shame, slander, vilification

Burton's Legal Thesaurus, 4E. Copyright © 2007 by William C. Burton. Used with permission of The McGraw-Hill Companies, Inc.

■

DEFAMATION, tort. The speaking slanderous words of a person so as, *de bona fama aliquid detrahere*, to hurt his good fame. Vide Slander.

2. In the United States, the remedy for defamation is by an action on the case, where the words are slanderous.

3. In England, besides the remedy by action, proceedings may be instituted in the ecclesiastical court for redress of the injury. The punishment for defamation, in this Court, is payment of costs and penance enjoined at the discretion of the judge. When the slander has been privately uttered, the penance may be ordered to be performed in a private place; when publicly uttered, the sentence must be public, as in the church of the parish of the defamed party, in time of divine service,, and the defamer may be required publicly to pronounce that by such words, naming them, as set forth in the sentence, he had defamed the plaintiff, and, therefore, that he begs pardon, first, of God, and then of the party defamed, for uttering such words. Clerk's Assist. 225; 3 Burn's Eccl. Law, Defamation, pl. 14; 2 Chit. Pr. 471 Cooke on Def.

A Law Dictionary, Adapted to the Constitution and Laws of the United States. By John Bouvier. Published 1856.

(23) *The areas of law governing professionals and businesses in the entertainment industry, particularly contracts and* <u>Intellectual Property</u>; *more particularly, certain legal traditions and aspects of these areas of law that are unique to the entertainment industry.*

The entertainment industry includes the fields of theater, film, fine art, dance, opera, music, literary publishing, television, and radio. These fields share a common mission of selling or otherwise profiting from creative works or services provided by writers, songwriters, musicians, and other artists.

## *.13   Contracts*

The entertainment industry exists in a state of economic uncertainty. Entertainment companies continually form, merge, re-form, and dissolve. Furthermore, consumer tastes in artistic products can change quickly, thrusting certain artists or artistic movements to the heights of popularity and reducing others to obscurity. Because of this instability, the entertainment industry relies on complex contracts, which usually are drafted to protect entertainment companies against economic risk.

Personal Service Agreements The <u>Personal Service</u> agreement is a primary legal instrument in the entertainment industry. It is negotiated between an artist and a company that manufactures, promotes, and distributes the artist's goods or services. The agreement often binds the artist to produce for one company for a certain peri-

od of time. Personal service agreements are often governed by statutes and are often the subject of litigation because they restrict the rights of artists to perform or create for any entity except for the company with whom they have contracted.

Artists generally do not have the resources necessary to manufacture, market, and distribute their goods or services. Instead, they must find an appropriate entertainment company to do so. Entertainment producers (e.g., book publishers, record companies, movie studios, and theaters) often invest large amounts of time and money in promoting and selling artists' talents or products to consumers. Most artists will fail to earn a profit for their producer. A few, however, will earn enormous sums. To ensure that artists who generate a profit will remain with the company, producers use personal service agreements to bind artists for a certain time, during which the producers attempt to recover their investment in the artist, make a profit, and cover losses from less successful artists.

In some entertainment industries, personal service agreements are structured using options. Options give a producer the right to extend an agreement for several time periods. For example, a record company may contract with a musician to provide one album during the first year of the agreement, with an option to extend the contract. After one year, if the record company feels that it would be economically wise to release a second album by the musician, the record company may exercise its option and require the musician to provide the second album. Under option contracts such as this, producers can keep artists on their roster for many years, or as long as the artists remain profitable.

## .14    The Fiduciary Duty of Entertainment Attorneys: _Joel v. Grubman_

An attorney has a duty to act solely in the client's best interests, to disclose any potential conflict of interest, and to withdraw if a conflict would impair the attorney's ability to represent the client. In 1992 pop singer Billy Joel sued his former attorney Allen J. Grubman and Grubman's law firm for $90 million, claiming that Grubman had committed <u>Fraud</u> and breach of contract. The suit alleged that while representing Joel throughout the 1980s, Grubman had defrauded the singer out of millions of dollars by negotiating secret deals with Joel's manager, Francis Weber, and by allowing Weber to control the law firm's representation, often in direct conflict with Joel's best interests. Joel claimed that if the firm had notified him of Weber's actions, Joel could have prevented millions of dollars in losses to his manager. The singer claimed that the law firm was concerned primarily with enhancing its own reputation by keeping him on its client roster, and did not want to risk losing Joel as a client by angering Weber.

Joel also alleged that Grubman failed to disclose that the law firm represented Joel's label, Sony Music, and that such representation was an inherent conflict of interest that biased Grubman's judgment during contract negotiations.

The law firm claimed that it had done nothing illegal or unethical in its representation of Joel, and stated that it was hired by Joel only to negotiate contracts, not to monitor the business ventures of Joel's manager. Furthermore, the firm claimed that Joel had earned millions of dollars as a result of his recording contract, proof that

its advice to him during negotiations with the label were not affected by the firm's relationship with Sony.

The case sent shock waves through the entertainment industry, where it is not uncommon for attorneys to represent both sides of a contract negotiation, or at least have ongoing client relationships with both sides, and it is also not uncommon for an attorney to respect the decisions of an artist's manager even though the attorney's client is the artist. Joel and Grubman settled the case without disclosing the terms of settlement.

Cross-references

<u>Attorney Misconduct</u>; <u>Conflict of Interest</u>.

Some option contracts can be disastrous for the artist. For example, musicians sometimes sign an option agreement without a provision that they may break the agreement if the record company fails to release their works. Many recording artists have been held in professional limbo by record companies that refuse to release their music and also refuse to allow them to record for another company. This practice, known as shelving, is used by some record companies to prevent economically risky artists from becoming valuable assets to other record companies.

Other entertainment industries use short-term personal service agreements rather than option agreements. For example, film studios often contract with actors, directors, screenwriters, and other creative artists on a one-film basis. Short-term agreements allow studios to avoid paying guaranteed fees to artists whose market might dissipate overnight. In the early days of the film industry, studios bound stars to long-term agreements. That system changed in the 1940s, when certain stars demanded fees that were higher than studios were willing to pay. Those stars then demanded, and received, one-film contracts for their services, which became the standard. The television industry, on the other hand, still uses long-term agreements for its talent in many areas.

Litigation over personal service agreements is common in the entertainment industry. Often, an artist who is relatively unknown is willing to enter into an agreement that drastically favors the company with which he or she is signing. Once the artist achieves success and sees the profits that the company is making from his or her services, the artist may demand higher fees or ROYALTIES, or to be released from the contract. Conflicts such as this often end up in court, where companies often demand that the court order that the artist not perform for anyone else while the contract is in dispute. (This type of order is known as a negative injunction.) Whether the contract will be enforced and the artist required to perform under the agreement is usually determined by whether the contract meets certain legal requirements based on the state laws that govern it.

Contract for Rights Another primary type of contract in the entertainment industry is the contract for rights. This contract often involves a transfer of <u>Copyright</u> ownership or a license to use certain creative property (e.g., a song or photo).

Many times, a contract for rights is combined with a personal service agreement. The agreement often will state that any work created by the artist during the term of the agreement is considered a work for hire. The company with whom the artist has contracted often receives automatic ownership of the copyright to a work for

hire. For a work for hire to exist, the artist must either be an employee of the company or create the work pursuant to a valid written
agreement—and even then, the work must fall within a few specific categories defined by copyright law.

A license is a contract through which the artist or copyright holder grants certain rights to another party and promises not to sue them for certain activities. For instance, a novelist might grant a license to a film studio to create a screenplay based on a novel. A license specifies the fee or royalty to be paid to the artist, the exact scope of use of the copyrighted material, and the time period for which the company may use the material, as well as any other conditions that the parties agree to attach to the license.

## .15   Unique Aspects of Entertainment Industry Contracts

Complex Royalty and Payment Provisions Because entertainment companies often risk large losses, the contracts they use often contain clauses that artists may consider to be unnecessarily complex or one-sided. For example, film studios often base payments to talent in part on net profits. The calculations that are necessary to determine net profits, as defined in a typical contract, can be mystifying to those who represent the talent. A screenwriter or an actor who receives bonuses or royalties on net profits might be paid little or nothing on a film that has earned hundreds of millions of dollars but is still showing a loss according to the net-profits calculation. Net-profits clauses have resulted in several high-profile lawsuits, including *Buchwald v. Paramount Pictures Corp.* (13 U.S.P.Q.2d [BNA] 1497 [Cal. Super. Ct. 1990]), *Garrison v. Warner Bros., Inc.* (No. CV 95-8328 [C.D. Cal. filed Nov. 17, 1995]), and *Batfilm Productions, Inc. v. Warner Bros.* (Nos. B.C. 051653 & B.C 051654 [Cal. Super. Ct. Mar. 14, 1994]).

Record companies also use complex contractual formulas to determine royalty payments to their artists. Companies typically offer seemingly large royalty percentages to artists. Various clauses in the recording agreements then are used to reduce the royalty percentages, reduce the number of units on which royalties are paid, and delay payment for many months. Although a few small record companies have made some effort to simplify the structure of recording agreements, the major record companies and their smaller affiliates have fought to maintain the more complex, formula-based agreements.

Advances Many entertainment contracts are structured with advances. Advances are payments made to an artist before any actual income is received by the company that manufactures or delivers the artist's products or services. For example, an author might receive an advance of $50,000 when a manuscript is approved by the publisher. This advance is normally nonrefundable, even if the publisher never earns money from the publication of the author's work. However, the publisher will keep any royalties that would have been payable to the author, until the author's advance and other expenses have been recouped by the publisher.

Contracts with Minors Contract law in many states requires that specific steps be taken in, or clauses added to, a contract with a minor, to ensure that the contract is valid. Often, companies will require that the minor's parents execute a valid release,

under which they guarantee the services of the child and agree to be held liable for damages if the child fails to perform under the terms of the contract.

Contracts with Intermediaries Successful artists are surrounded by many individuals who are responsible for enhancing and protecting their career. Unknown artists use the services of such intermediaries to help them become known to more powerful figures in the entertainment industry. Intermediaries have various names and functions, but all serve to promote an artist's visibility and success in the industry. For this service, they generally take a percentage of an artist's earnings or a portion of the artist's property rights in the artist's creations.

Agents Agents are individuals who procure employment and other opportunities for artists. In film production, agents find actors roles or pitch screenwriters' works to studios, producers, and actors. In music production, agents procure live engagements for musicians. In book publishing, agents attempt to secure publishing agreements for authors. For their services, agents often receive between five and 25 percent of an artist's revenues that are obtained through the agents' efforts. Agents nearly always require an artist to use only their services, while they usually serve many artists. Agents are strictly regulated in some states, especially states with large and successful entertainment enterprises. Agents have become powerful figures in the entertainment industry.

Personal Managers Personal managers are individuals who guide various aspects of an artist's career. In the early stages of an artist's career, the manager might act as agent, publicist, contract negotiator, and emotional counselor. As an artist gains in stature and income, the personal manager's primary tasks are to choose and to direct specialists to handle various aspects of the artist's career. For these services, personal managers often receive 10 to 20 percent of an artist's income from all sources.

Attorneys Attorneys in the entertainment industry perform many standard legal functions such as conducting litigation, giving business advice, protecting intellectual property, and negotiating contracts. Entertainment attorneys also serve as industry intermediaries, promoting their clients in order to procure contracts for the artists' products and services. For these services, entertainment attorneys are paid either an hourly fee or a percentage of an artist's income.

Entertainment attorneys often face difficult conflicts of interest. For example, an attorney who has represented a record company is often pursued by a recording artist to shop the artist's material to that company. The artist knows that the company will often trust the attorney's opinion of the artist's marketability, which gives the artist a better chance of obtaining a recording contract. The attorney, however, is often privy to confidential information about the record company, or still represents the company in related negotiations. Attorneys and artists have been involved in several high-profile disputes because of such conflicts of interest.

## .16   *Intellectual Property*

The entertainment industry's primary product is intellectual property, protected by copyrights, Trademarks, and the right of publicity. A majority of the terms in entertainment contracts concern the ownership and use of this property.

Songs, plays, films, works of fine art, books, and even some choreographed works are copyrightable. The contractual terms that define the ownership and use of these works are often negotiated for months, with both the artist and the entertainment company vying for as much control of the intellectual property as possible.

U.S. copyright law contains provisions that are specifically directed at the entertainment industry. For example, the songwriter—or the copyright holder, if the songwriter has transferred the song's copyright or created the song as a work for hire—decides who can first record a song for publication. However, once the song has been recorded and published, the copyright holder may no longer limit who may record the song. If a song's copyright owner has previously granted permission to someone to record a song, or if the songwriter has recorded and commercially released a recording of the song, the copyright holder is required by copyright law to grant a license to anyone else who wants to record that song. This is called a compulsory license. A licensee who records a song under a compulsory license is required to follow strict statutory guidelines for notification of its use and reporting sales and royalties to the copyright holder. The fee for a compulsory license is set by Congress at a few cents per recording manufactured and is adjusted for inflation every few years.

A separate copyright exists in each legally recorded version of a song. Therefore, when a musician records a song after receiving the appropriate license from the owner of the song's copyright, that musician owns a separate copyright in the recorded version of the song.

Copyright law also directly addresses the unique needs of dance, theater, and other performing arts. A creator of choreography may claim a copyright for that choreography once it has been fixed in a tangible form, such as on a video recording. The choreography then may be used only with the permission of the copyright holder.

One key aspect of copyright law as applied to the entertainment industry is that of derivative works. A copyright holder initially controls who may create a work based on the artist's original work. For instance, a film studio generally may create a screenplay based on a novel only with the novelist's, or other copyright holder's, written permission. This control is critical to authors and screenwriters, whose works can be adapted to several other media—films and sequels, television series and movies, audiotapes, toys, games, T-shirts, and other products derived from the work. An author can forgo millions of dollars of potential income simply by allowing a publisher to own and control the rights to create and license any such derivative works based on the author's work.

Entertainment company names, band names, performers' pseudonyms, and, more rarely, performers' legal names, can be protected under U.S. TRADEMARK LAWS. Like other businesses, entertainment entities have an interest in preventing others from using names that are so similar to theirs as to cause confusion among consumers as to exactly who is delivering certain products or services. Therefore, many entertainment entities register their names with the U.S. Patent and Trademark Office and claim the exclusive right to use their names. In most cases, such names will be registered as service marks, rather than as trademarks. For instance, bands who register their band name as a TRADEMARK typically will register for performance of entertainment services. Once an entity receives a registration from the U.S. Patent

and Trademark Office, no other entity may use the name, or a confusingly similar name, to provide services similar to those provided by the registrant.

Use and ownership of trademarks by members of a band or other entertainment company can be a source of great controversy when the entity dissolves. If, prior to dissolution, the owners or members of the entity have not agreed as to who may use the trademark after dissolution, lengthy legal battles can result as different members or factions try to use, and prevent the other members from using, the trademark.

### .17  Electronic Copyright

A new format known as MP3 (Motion Picture Experts Group-1 Audio Layer 3), which can compress and store high-quality, digital music in one-tenth of the space in which a CD can store it, has recently caused considerable legal ramifications in the entertainment industry. Access to this digitized music is widespread and growing rapidly. Electronic distribution and the digitization of music has the potential to radically reduce royalties to artists.

Napster In early 1999, Shawn Fanning, who was only 18 at the time, began to develop an idea as he talked with friends about the difficulties of finding the kind of MP3 files they were interested in. He thought that there should be a way to create a program that combined three key functions into one. These functions included a search engine, file sharing, (i.e., the ability to trade MP3 files directly, without having to use a centralized server for storage) and an <u>Internet</u> Relay Chat (IRC), which was a means to find and chat with other MP3 users while online. Fanning spent several months writing the code that would become the utility later known world-wide as Napster. Napster became a non-profit on-line music-trading program that became especially popular among college students, who typically had access to high-speed Internet connections.

In April 2000, the heavy metal rock group Metallica sued Napster for copyright infringement. Several universities were also named in this suit. Metallica claimed that these universities violated Metallica's music copyrights by permitting their students to access Napster and to illegally trade songs using university servers. A number of universities already had banned Napster prior to April 2000 because of concerns about potential copyright infringement and/or because traffic on the Internet was slowing university servers down. Yale University, which was named in the suit, immediately blocked student access to Napster.

Metallica argued that Napster facilitated illegal use of digital audio devices, which they alleged was a violation of the <u>Racketeering</u> Influenced and Corrupt Organizations (RICO) act. Napster responded that copying a song from a CD to a personal computer—when that CD was lawfully purchased—is a reasonable use of the copyrighted material according to the fair use doctrine. They argued further that if this file happens to be accessible on the Internet, then others can access or download it without being guilty of a crime, or civilly liable for copyright infringement. Napster further claimed that since it made no profit from the trades, it owed no money in royalties. Among other things, when courts determine whether fair use has occurred, they assess how much of the copyrighted material was used and the econom-

ic effect this use has on the copyright owner. The U.S. Court of Appeals for the Ninth Circuit held that Napster's operation constituted copyright infringement.

## .18    Personal Rights

A successful artist's name and image can become valuable commodities. Use of the artist's name and likeness by another party can infringe on rights held by the artist. The legitimacy of such uses is often unclear and is based on several areas of law that overlap and sometimes contradict each other, such as right to privacy, right to publicity, Unfair Competition, Defamation, and First Amendment law.

Concerns about long-term contracts and record labels taking advantage of rock stars have caused major stars to lobby Congress. Don Henley, Sheryl Crow and Alanis Morissette have spoken before Congress on the need for rock stars to represent their own interests, without so much interference or control from record companies. Singer-songwriter Don Henley, co-founder of the Recording Artists Coalition, which represents dozens of stars, including Eric Clapton, Joni Mitchell, Q-Tip, and Peggy Lee, said of the movement, "Record companies have been screwing artists for ages. It's time we organize and fight back. We've got our own trade group now. We're going to Washington."

Further readings

*The Entertainment and Sports Lawyer* (various issues).

Levitt, Carole, and Mark Rosch. 2003. "Finding Entertainment Law Online, from Scholarship to Scandals." *Los Angeles Lawyer* 26 (May).

Lisa Stansky. 2002. "Contracts, Rights, and Land Deals—That's Entertainment." *Student Lawyer* 31 (November).

*Loyola of Los Angeles Entertainment Law Review* (various issues).

Cross-references

Art Law.

West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

(24)

Advertisement (Bad banner? Please let us know)    *Intangible rights protecting the products of human intelligence and creation, such as copyrightable works, patented inventions,* Trademarks, *and trade secrets. Although largely governed by federal law, state law also governs some aspects of intellectual property.* Intellectual property describes a wide variety of property created by musicians, authors, artists, and inventors. The law of intellectual property typically encompasses the areas of Copyright, Patents, and trademark law. It is intended largely to encourage the development of art, science, and information by granting certain property rights to all artists, which include inventors in the arts and the sciences. These rights allow artists to protect themselves from infringement, or the unauthorized use and misuse of their creations. Trademarks and service marks

protect distinguishing features (such as names or package designs) that are associated with particular products or services and that indicate commercial source.

Copyright laws have roots in eighteenth-century <u>English Law</u>. Comprehensive patent laws can be traced to seventeenth-century England, and they have been a part of U.S. law since the colonial period. The copyright and patent concepts were both included in the U.S. Constitution. Under Article I, Section 8, Clause 8, of the Constitution, "The Congress shall have Power ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The first TRADE-MARK LAWS were passed by Congress in the late nineteenth century, and they derive their constitutional authority from the <u>Commerce Clause</u>. The bulk of intellectual <u>Property Law</u> is contained in federal statutes. Copyrights are protected by the Copyright Act (17 U.S.C.A. §§ 101 et seq. [1994]); patents are covered in the Patent Act (35 U.S.C.A. §§ 101 et seq. [1994]), and trademark protection is provided by the <u>Lanham Act</u> (also known as the Trademark Act) (15 U.S.C.A. §§ 1501 et seq. [1994]).

## .19    *Napster and Intellectual Property*

In early 1999, Shawn Fanning, who was only 18 at the time, began to develop an idea as he talked with friends about the difficulties of finding the kind of MP3 files they were interested in. He thought that there should be a way to create a program that combined three key functions into one. These functions included a search engine, file sharing (the ability to trade MP3 files directly, without having to use a centralized server for storage), and an Internet Relay Chat (IRC), which was a means of finding and chatting with other MP3 users while online. Fanning spent several months writing the code that would become the utility later known world-wide as Napster. Napster became a nonprofit on-line music-trading program which became especially popular among college students who typically have access to high-speed Internet connections. In April 2000 the heavy metal rock group Metallica sued the on-line music-trading Website Napster for <u>Copyright</u> infringement. Several universities were also named in this suit. Metallica claimed that these universities violated Metallica's music copyrights by permitting their students to access Napster and illegally trade songs using university servers. A number of universities had banned Napster prior to April 2000 because of concerns about potential copyright infringement and/or because traffic on the Internet was slowing down university servers. Yale University, which was named in the suit, immediately blocked student access to Napster.

Metallica argued that Napster facilitated illegal use of digital audio devices, which the group alleged was a violation of the Racketeering Influenced and Corrupt Organizations (RICO) act, 18 U.S.C. § 1961. Napster responded that the Fair Use Act allows owners of compact discs to

use them as they wish. Therefore if an owner of the disc decides to copy it into a computer file, he or she should be allowed to do so. If this file happens to be accessible on the Internet, then others can also access or download it without being guilty of a crime. Napster further claimed that since it made no profit off the trades, it owed no money in ROYAL-TIES. The Ninth Circuit held that Napster's operation constituted copyright infringement.

**Further readings**

Alderman, John. 2001. Sonic Boom: Napster, P2P, and the Battle for the Future of Music. New York: Perseus.

Merriden, Trevor. 2001. Irresistible Forces: The Business Legacy of Napster and the Growth of the Underground Internet. New York: John Wiley and Sons.

**Cross-references**

<u>Art Law</u>.

Intellectual property laws give owners the exclusive right to profit from a work for a particular limited period. For copyrighted material, the exclusive right lasts for 70 years beyond the death of the author. The length of the right can vary for patents, but in most cases it lasts for 20 years. Trademark rights are exclusive for ten years and can be continually renewed for subsequent ten-year periods.

Intellectual property laws do not fall in the category of <u>Criminal Law</u>, *per se*. Some copyright laws authorize criminal penalties, but by and large, the body of intellectual property law is concerned with prevention and compensation, both of which are civil matters. This means that the owner, not the government, is responsible for enforcement.

Intellectual property laws provide owners with the power to enforce their property rights in civil court. They provide for damages when unauthorized use or misuse has occurred. They also provide for injunctions, or court orders, to prevent unauthorized use or misuse.

The property protected by copyright laws must be fixed in a tangible form. For example, a musician may not claim copyright protection for a melody unless it has been written down or somehow actualized and affixed with a recognizable notation or recorded. A formula or device may not receive patent protection unless it has been presented in whole to the U.S. <u>Patent and Trademark Office</u>; even then, it must satisfy several tests in order to qualify. A symbol may not receive trademark protection unless it has been placed on goods or used in connection with services.

## *.20 Copyrights*

Copyright laws grant to authors, artists, composers, and publishers the exclusive right to produce and distribute expressive and original work. Only expressive pieces, or writings, may receive copyright protection. A writing need not be words on paper: In copyright law, it could be a painting, sculpture, or other work of art. The writing element merely requires that a work of art, before receiving copyright protection, must

be reduced to some tangible form. This may be on paper, on film, on audiotape, or on any other tangible medium that can be reproduced (i.e., copied).

The writing requirement ensures that copyrighted material is capable of being reproduced. Without this requirement, artists could not be expected to know whether they were infringing on the original work of another. The writing requirement also enforces the copyright rule that ideas cannot be copyrighted: Only the individualized expression of ideas can be protected.

Copyrighted material must be original. This means that there must be something sufficiently new about the work that sets it apart from previous similar works. If the variation is more than trivial, the work will merit copyright protection.

Functionality can be a factor in copyright law. The copyrights to architectural design, for example, are generally reserved for architectural works that are not functional. If the only purpose or function of a particular design is utilitarian, the work cannot be copyrighted. For instance, a person may not copyright a simple design for a water spigot. However, if a person creates a fancy water spigot, the design is more likely to be copyrightable.

Copyrighted material can receive varying degrees of protection. The scope of protection is generally limited to the original work that is in the writing. For example, assume that an artist has created a sculpture of the moon. The sculptor may not prevent others from making sculptures of the moon. However, the sculptor may prevent others from making sculptures of the moon that are exact replicas of his own sculpture.

Copyright protection gives the copyright holder the exclusive right to (1) reproduce the copyrighted work; (2) create derivative works from the work; (3) distribute copies of the work; (4) perform the work publicly; and (5) display the work. The first two rights are infringed whether they are violated in public or in private. The last three rights are infringed only if they are violated in public. *Public* showing is defined under the Copyright Act of 1976 as a performance or display to a "substantial number of persons" outside of friends and family (17 U.S.C.A. § 101).

Infringement of copyright occurs whenever someone exercises the exclusive rights of the copyright owner without the owner's permission. The infringement need not be intentional. Copyright owners usually prove infringement in court by showing that copying occurred and that the copying amounted to impermissible appropriation. These showings require an analysis and comparison of the copyrighted work and the disputed work. Many general rules also relate to infringement of certain works. For example, a character created in a particular copyrighted work may not receive copyright protection unless he or she is developed in great detail and a character in the disputed work closely resembles that character.

The most important exception to the exclusive rights of the copyright holder is the "fair use" doctrine. This doctrine allows the general public to use copyrighted material without permission in certain situations. To varying extents, these situations include some educational activities, some literary and social criticism, some Parody, and news reporting. Whether a particular use is fair depends on a number of factors, including whether the use is for profit; what proportion of the copyrighted material is used; whether the work is fictional in nature; and what economic effect the use has on the copyright owner.

The rise in electronic publication in the late twentieth century, particularly the widespread use of the Internet since the mid 1990s, caused new concerns in the area of copyright. A web site called Napster, which provided a file-sharing system whereby users could trade electronic music files, became one of the most popular sites on the Internet. The company had an estimated 16.9 million worldwide users, and the system accommodated about 65 million downloads. The Recording Industry Association of America sued Napster, eventually causing Napster to close down. During the late 1990s, Congress enacted a series of laws that had significant impacts on the law of copyright. In 1998, Congress enacted the Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, 112 Stat. 2827 (17 U.S.C.A. §§ 101 et seq.), which extended the terms of existing and new copyrights by 20 years, against the protests of several Lobbying groups. Also in 1998, Congress approved the Digital Millennium Copyright Act (DMCA), Pub. L. No. 105-304, 112 Stat. 2860 (17 U.S.C.A. §§ 101 et seq.), a broad-based piece of legislation that was designed to bring copyright law into the digital age.

## .21  Patents

Patent laws encourage private investment in new technologies by granting to artists the right to forbid all others to produce and distribute technological information that is new, useful, and non-obvious. The statutory requirements for patent protection are more stringent than those for copyright protection. Furthermore, because patent protection for commercial products or processes can give a tremendous market advantage to businesses, those seeking patents often find opposition to their applications. Patent protection can be obtained only through the U.S. Patent and Trademark Office.

The novelty requirement focuses on events that occur prior to the invention. Under Section 102 of the Patent Act, an invention is not novel if it is publicly used, sold, or patented by another inventor within 12 months of the patent application. This definition implements the public policy that favors quick disclosure of technological progress.

Often, two inventors apply for a patent for the same product or process within the same 12-month period. Three factors determine who wins the patent: the date and time that the product or process was conceived; the

date and time that the product or process was reduced to practice; and the diligence that was used to pursue patent protection and to perfect the discovery. Generally, the first inventor to conceive the product or process has priority in the application process. However, if the second inventor is the first to reduce the product or process to practice, and the first inventor does not use diligence to obtain patent protection, the second inventor is given priority in the application process.

The utility requirement ensures that the product or process receiving patent protection will have some beneficial use. The inventor must specify in the application a specific utility for the invention. If the application is for a patent on a process, the process must be useful with respect to a product. A process that is new and non-obvious, yet useless, does not increase knowledge or confer any benefit on society.

Non-obviousness is not the same as novelty. Not everything that is novel is non-obvious. Anything that is non-obvious is novel, however, unless it already has been patented. The nonobviousness requirement focuses on existing technology, or "prior art." In determining whether an invention is non-obvious, the U.S. Patent and Trademark Office analyzes the prior art, examines the differences between the invention and the prior art, and determines the level of ordinary skill in the art. Generally, if an invention is obvious to a person of ordinary skill in the relevant art, it is not patentable.

When an inventor claims that his or her patent has been infringed, the court generally engages in a two-step process. First, it analyzes all of the relevant patent documents. It then reads the patent documents and compares them with the device or process that is accused of infringement. If each element of the accused device or process substantially duplicates an element in the patented device or process, the court may declare that the patent has been infringed. Infringement can occur only if another person uses, makes, or sells the patented device or process without the permission of the person who has received the patent.

When a patented device or process is infringed, the patent holder, or patentee, may recover in damages an amount equal to a reasonable royalty. If the infringement was willful, the infringing party may be forced to pay three times the reasonable royalty. If successful in court, the patent holder also may recover court costs and attorneys' fees. If the patent holder anticipates infringement, he or she may apply for an Injunction, which would prohibit a certain party from infringing the patent. An injunction may also issue after a finding of infringement, to prevent repeat infringement.

## .22    Trademarks

Trademark laws allow businesses to protect the symbolic information that relates to their goods and services, by preventing the use of such features by competitors. To receive trademark protection, a mark usually must be distinctive. *Distinctiveness* generally applies to any coined or

fanciful word or term that does not closely resemble an existing mark. A mark generally will not receive trademark protection if it is a common or descriptive term used in the marketplace.

To receive trademark protection, a mark must be used in commerce. If two or more marketers claim ownership of a certain mark, the first user of the mark will usually receive the protection. When the mark is known to consumers only in a limited geographic area, though, it may not receive protection in areas where it is unknown.

Infringement occurs if a mark is likely to cause confusion among consumers. In determining whether confusion is likely, the court examines a number of factors, including the similarity between the two marks in appearance, sound, connotation, and impression; the similarity of the goods or services that the respective marks represent; the similarity of the markets; whether the sale of the goods or services is inspired by impulse or only after careful consideration by the buyer; the level of public awareness of the mark; whether shoppers are actually confused; the number and nature of similar marks on similar goods or services; the length of time of concurrent use without actual confusion on the part of shoppers; and the variety of goods or services that the mark represents (*In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 U.S.P.Q. 563 [1973]).

Defenses to infringement include fair use and collateral use. Fair use occurs when the second user, or repossessor, uses a protected mark in a non-conspicuous way to identify a component of a good or service. For example, a restaurant may use a protected mark to advertise that it serves a particular brand of soft drink, without infringing the mark. However, the restaurant may not identify itself by the mark without infringing the mark.

Collateral use is use of the same mark in a different market. For example, assume that a tree surgeon has received trademark protection for the mark Tree Huggers. This protection might or might not prevent a business that sells logging boots from using the same mark. However, if the mark for the boots is written or otherwise appears with the same defining characteristics as the mark for the tree surgeon, it risks being denied trademark protection, depending on whether it can be confused by consumers.

Remedies for infringement of a protected trademark consist of damages for the profits lost owing to the infringement; recovery of the profits realized by the infringer owing to the infringement; and attorneys' fees. A trademark holder also may obtain injunctive relief to prevent infringement.

## .23    *Other Forms of Intellectual Property*

The body of intellectual property law also includes laws relating to trade secrets, Unfair Competition, and the right of publicity. Trade Secret laws protect any formula, pattern, device, or compilation of in-

formation that provides a business advantage over competitors who do not use or know of it. A strategy to increase worker productivity, for example, is a trade secret. Trade secrets do not receive patent protection because they are not inventive. Trade secret laws are included in intellectual property laws because, like other intellectual property laws, they prevent the unauthorized use of certain intangible subject matter.

The right of publicity is the right of a person to control the commercial value and exploitation of his or her name, voice, or likeness. Because right-of-publicity laws promote artistic and commercial pursuits, they are included among intellectual property law. These laws are usually reserved for celebrities and other public figures whose name and image are important to their career. By allowing celebrities the right to control the commercial use of their name, voice, and image, right-of-publicity laws protect the commercial potential of entertainers.

## .24    Developments

Artists face problems protecting their property in other countries because not all countries subscribe to international agreements regarding intellectual property. This has led to widespread unauthorized copying. In the 1990s, China and Mexico were identified as especially serious offenders. In both countries, music and films are copied and sold openly without compensation to the creators. The United States threatened to impose trade sanctions against China if it did not observe international copyright treaties. Such threats illustrate that the United States places a high priority on protecting the right of artists to profit from their work.

**Further readings**

Burgunder, Lee B. 2002. "Reflections on *Napster*: The Ninth Circuit Takes a Walk on the Wild Side." *American Business Law Journal* 39 (summer): 683–707.

Byrne, John G. 1995."Changes on the Frontier of Intellectual Property Law: An Overview of the Changes Required by GATT." *Duquesne Law Review* 34 (fall): 121–37.

Goldstein, Paul. 2002. *Copyright, Patent, Trademark, and Related State Doctrines: Cases and Materials on the Law of Intellectual Property.* 5th ed. New York: Foundation Press.

Gray, Megan E., and Will Thomas DeVries. 2003. "The Legal Fallout from Digital Rights Management Technology." *Computer and Internet Lawyer* 20 (April): 20–35.

Letterman, G. Gregory. 2001. *Basics of International Intellectual Property Law.* Ardsley, N.Y.: Transnational Publishers.

McJohn, Stephen M., and Roger S. Haydock. 2003. *Intellectual Property: Examples and Explanations.* New York: Aspen.

Vaidhyanathan, Siva. 2001. *Copyrights and Copywrongs: The Rise of Intellectual Property and How It Threatens Creativity.* New York: New York Univ. Press.

**Cross-references**

Art Law; Copyright, International; Entertainment Law; Literary Property; Music Publishing; Trade Dress; Trade Name.
West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc. All rights reserved.

(25)  18 USC § 35 –Imparting or conveying false information.

(26)  42 USC § 1985 – Conspiracy to interfere with civil rights.

(27)  18 USC § 1622 – Subordination of perjury by procuring another to commit perjury.

(28) 18 USC § 1512 – Engaging in misleading conduct.

(29)  18 USC § 1905 – Disclosure of information generally.

(30)  18 USC § 1509 – Impeding due exercise of rights by attempting to prevent, obstruct, impede and interfere with same. U.C.C §1-308, U.C.C §1-303 U.C.C.§1-103.6, U.C.C. § 1-103, and all of the U.C.C Violations/Crimes.

(31)  These men are guilty of Crime, criminal offence, criminal offense, lawbreaking, offense, offence. ( criminal law) an act punishable by law usually considered an evil act.

(32) 10 USC § 921, Article 121 – Larceny and wrongful appropriation.

(33)  18 USC§ 241 – Conspiracy against rights of sovereign, free, God created, spirit and soul beings.

(34) 18 USC § 1117 –Conspiracy to Murder

(35)  18 USC § 1652 –Citizens As Pirates

(36)  10 USC § 920 A, Article 120a--- Stalking

# Remedy And Relief

Ibrahim Annan would like to be compensated $531,000,000.00.

Title 28 USC § Perjury Cases 1760-28 U.S.C. §---1746. Unsworn Declarations.

COUNT I- DEFAMATION PER SE.

COUNT II-DEFAMATION PER SE

The jurisdiction of the Court is invoked pursuant to title 18 U.S.C. § 3486. U.C.C § 1-308, U.C.C. § 1-303 and all of the U.C.C.

**The jurisdiction is invoked pursuant to Right to inform Federal Officials of violations of Federal Laws is within broad protection of this section proscribing conspiracy to violate Civil Right's <u>U.S. v. Smith</u>, Ca.9(Cal.)1980, 623 F.2d 627.**

To Whom It May Concern my personal relation with this woman was not this man's business. Detective Grant called me a 'baby fucker' on January 27, 2010.  Compensate Ibrahim Annan $250,000,000.00 for this Emotional Distress, and defamation of character.

There was another moment during the questioning when Detective Albeck or Alback said what are you into old ladies, I was shocked, I did not know what he meant.  Date: January 27, 2010.

Special appearance fee required for this day, January 27, 2010, is also requested $750,000.00.

The violation of sovereign authority: the amount of $750,000.00 (seven hundred and fifty thousand dollars).  Plus $250,000.00 (two

1

hundred and fifty thousand dollars) for every fifteen minutes or any part thereof, that I, Ibrahim Annan, was in the CITY OF NEW YORK POLICE Department custody:

$5,000,000.00 (five million dollars) for this day.


I, Ibrahim Annan would like to be compensated for this abuse, terror, and harassment.

Title 28 USC § Perjury Cases 1760-28 U.S.C. §---1746.Unsworn Declarations.


Ibrahim Annan wishes the remedy recourse, and relief for Ed

Maldonado crimes to be $13,000,000,000. The jurisdiction of the

Court is invoked pursuant ----Hale v. Henkel, § 201

U.S.43(1905)-96


Your amount due is $13,000,000.00, Mr. Maldonado.

1. Alback Albeck----$13,000,000.00—date of crimes 1/24/2010, 1/27/2010.

2. Ed Maldonado----$13,000,000.00---date of crimes 1/21/2012, and more.

3. James Rose-----$250,000,000.00--date of crimes 1/27/2010 and 5/12/2011

2

4. Bert Grant ----$250,000,000.00—date of crimes 1/27/2010 and 5/12/2011

The total amount for the parties listed:  $531,000,000.00   (Five Hundred and thirty-one million dollars)

Payable in dollars or Gold.  Pursuant to Title 28,USC 1746(1) and executed "without the United States," I affirm under penalty of perjury under the laws of the united states of America that the foregoing is true and correct, to the best of my belief ,and informed knowledge.  And Further deponent saith not.  I now affix my signature and official seal to all of the above affirmations with EXPLICIT RESERVATION OF ALL OF MY UNALIENABLE RIGHTS, WITHOUT PREJUDICE to any of those rights pursuant to UCC 1-207.4 UCC 1-308, and UCC 1-103.6, UCC1-103.

Thank you for your attention and for your prompt and full compliance with the terms of this NOTICE. Your courtesy is appreciated.

Respectfully,

Ibrahim
Annan_____Notary_____
_____

People/Principal, by Special Appearance, in Propia Persona, proceeding Sui Generis, Sui Juris, with Assistance Special

Page 1 of 2                          LEGAL NOTICE:  ACCOMPANYING All AFFIDAVITS

FROM:                                    DATE 5 29/20/2

Ibrahim Annan

800 Victory Blvd Staten Island, New York

Postal Code 10301

In Pro Per, Sui Juris

## LEGAL NOTICE

Name/Title_____

Address_____

City:_____    State_____    Postal Code_____

To WHOM IT MAY CONCERN:

The purpose of this LETTER and the attached AFFIDAVITS incorporated herein is to give you, your office and your Principals Constructive LEGAL NOTICE of my election to:

1)      Revoke all powers of attorney granted unknowingly to various agencies of the government,

2)      EXPATRIATE from the jurisdiction of the federal United States, reclaim my sovereign (state) citizenship, RESERVE ALL MY UNALIENABLE RIGHTS by virtue of the Treaty Of Peace ,and Friendship,  Declaration of Independence (1776), and  the Constitution for the United States and the Bill Of Rights (1791), and 200 years of positive American Law,

3)      REPUDIATE any presumed obligation to pay a fraudulent and unlawful national debt on an undeclared federal and State bankruptcy,

4)      **Revoke ANY and ALL CONTRACTS** entered into with agencies of the government unknowingly and unintentionally waving rights for privileges, revoke my signature or authorization on ANY and All contracts, documents or things in the possession, custody and/or control, of either AGENT or PRINCIPAL,

5)      **Expose the high crimes and misdemeanors of public officials and attorneys acting under "Color of Law," violating their oaths of allegiance to the U.S. Constitution, their office, and the United States of America, and acting as the express agents of Foreign Principals/Creditors, extorting both property and money from the American people,** while SUPPORTING public officials with the courage to stand up to this injustice,

6)      RESTORE the sovereign rights and property of all the people of the united states of America (including Indigenous Aboriginal People black, women, minorities, People),

7)      RESTORE a lawful and constitutional republican form of government with sovereignty vested in We the People including a lawful money system.

        **This is a LEGAL NOTICE to all elected, appointed or employed officials including police officers, agents, or representatives of the city, county, state and/or federal government, including corporations and attorneys. That you can no longer act on my behalf or take ANY action without my consent, without TRESPASSING upon my person or property. That any action involving a citation or ticket, extortion, confiscation, impoundment or illegal search and seizure of my private property by a police officer or Any other public servant or employee will be considered a willful act to deprive me of my constitutionally protected rights as an American National Moor (State) People. ANY action by a police officer, officer of the court, public servant or government official to assert unlawful authority under the color of law" will be construed as a direct and willful violation of my constitutionally protected rights and prosecuted to the full extent of American law. (Title 18 USC 241 and 242)**

1

I understand that such a NOTICE requires the GROUNDS which are set forth hereunder, attached hereto, and incorporated herein as follows: *That the federal, state and local governments have engaged in constructive fraud and misrepresentation, undue influence and/ or concealment of facts by NOT fully informing me, by withholding information and intentionally deceiving me* and the American people about our lawful citizenship and our unalienable rights. That no responsible or honest disclosure occurred with ANYONE in any branch of government regarding the implications of unconscionable contracts entered into BEFORE or AFTER coming of legal age.

At the time of application for a Birth Certificate and Social Security Number, I was incompetent by way of age to enter into any contract with an implied consent or power of attorney to any individual, person or legal fiction. I was not informed by any person at that time, or any time thereafter, that I was NOT REQUIRED to apply for and/ or accept that Number in order to obtain work in any occupation or profession of common right in the community. I was NOT informed that application for and acceptance of such a Number or any other such License, Insurance, Benefit Privilege, Franchise, etc. would subject me to the jurisdiction of Admiralty/ Maritime/Merchant/International Law, and/or the Uniform Commercial Code, and/or the jurisdiction and authority of the internal revenue code of 1954, the Buck Act of 1940, the Public Employees Salary Act of 1939 and all its predecessors including 14th Amendment. Nor was I Informed that application for and acceptance was an implied waiver of my sovereign (state) citizenship and unalienable rights protected by the Treaty Of Peace ,and Friendship and Declaration of Independence ,and the Bill Of Rights Or Constitution.

Therefore by this Notice and the attached AFFIDAVITS incorporated herein as prima facie evidence. I hereby REVOKE, CANCEL, and RENDER any and all documents and things which you or your department/ Administration may have in your possession, custody, and/ or power of attorney entered into knowingly, unknowingly unwillingly and unintentionally, **Null and VOID**, *Nunc Pro Tunc.* **NOTICE to Principals is NOTICE to Agents. NOTICE to Agents is NOTICE to Principals,**

**Furthermore, I am REQUIRING you and your Department/Administration, Agencies, Commissions and/or Divisions, and/or Agents, Officers, and/or employees thereof, under the authority of the ethics in Government Act (P.L. 96-103), the Freedom of Information Act and the Privacy Act (1974), that within thirty (30) days of your receipt of this NOTICE,** *all documents and things in your possession, custody and control be purged from my files destroyed any reference to any file to my previous Account Number NULL and Void for any purpose whatsoever and written response made directly to me reporting the TERMINATION of any contractual relations between us.*

Pursuant to Title 28,USC 1746(1) and executed "without the United States," I affirm under penalty of perjury under the laws of the united states of America that the foregoing is true and correct, to the best of my belief ,and informed knowledge. And Further deponent saith not. I now affix my signature and official seal to all of the above affirmations with EXPLICIT RESERVATION OF ALL OF MY UNALIENABLE RIGHTS, WITHOUT PREJUDICE to any of those rights pursuant to UCC 1-207.4 UCC 1-308,and UCC 1-103.6 .

Thank you for your attention and for your prompt and full compliance with the terms of this NOTICE. Your courtesy is appreciated.

Respectfully,    *without Prejudice  UCC-303*

Ibrahim Annan *UCC1-308 Ibrahin anan  UCC1-103(6* _____Notary_____

People/Principal, by Special Appearance, in Propia Persona, proceeding Sui Generis, Sui Juris ,with Assistance Special

*Sworn to before me on May 29 2012*

DIANE MULE
Notary Public, State Of New York
No. 04MU6080480
Qualified In Richmond County
Commission Expires September 16, 20 *N*

2

## RIGHT TO TRAVEL (Affidavit 4)

State of New York
County of Richmond          RICHMOND COUNTY CLERK

RECORDING REQUESTED BY:    2011 FEB -3 ｱ P 1: 07

RECEIVED COURT DESK

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

AFFIDAVIT: Right to Travel

## AFFIDAVIT: Right to Travel

Know All men and Women By these Presents, that I, _IbeAHIm Annan_
Being First Duly Sworn, deposes and says:

That I have researched extensively the organic laws of the United States of America, including two
hundred years of American case law (i.e. common law), and now affirm that I have secured the
Unalienable and Fundamental, Unrestricted and Unregulated Right To Travel, upon both the
public walkways and the highways, and transport my personal and allodial property, duly
conveyed, unhindered by Any private, corporate or statutory law, or Department of Motor
Vehicles (DMV) regulation or so-called requirement. This unalienable right to travel is guaranteed
by the 9th & 10th Amendments of the organic Constitution for the United States of America and
Bill of Rights, and upheld by many court decisions in support of that right. I, now explicitly
Reserve, Assert and Defend that right.

The Affidavit is submitted upon demand of a driver's license, registration or proof of insurance as
part of the official record of Any ensuing action and must be introduced as evidence in said action.

That I, _IbeAhim Annan_          do Not under Any circumstances utilize the
public highways for commercial purposes. I am Not a 14th Amendment legal "person" engaged in
interstate commerce, nor do I derive income from the travel and transport of goods. I am Not a
"driver," nor am I an "operator" of a "motor vehicle. The driver's license is for motor vehicles
involved in commerce only. My private, self-propelled contrivance/carriage is Not involved in
commerce, therefore, it is Not a "motor vehicle." The corporate State of New York Department of
Motor Vehicle code does not disclose the true intent and purpose of the statutes, though a "motor
vehicle" is adequately and clearly defined in the United States Code (USC).

"_Motor Vehicle_ means every description of carriage or other contrivance propelled or drawn by
mechanical power and used for commercial purposes." —18 USC 31

Affidavit: Right To Travel
Page 1 of 3

*"The privilege of using the streets and highways by the operation thereon of <u>motor carriers for hire</u> can be acquired only by permission or license from the state or its political subdivision."*
—*Black's Law Dictionary, 5th ed, page 830*

I, *Ibrahim Annan* _____ cannot in good faith apply for and accept a driver's license, as I would be committing Perjury. I would have to Swear under Oath that I am a member of, citizen of, franchisee of, or resident (agent) of (fudiciary, surety for) the corporate State of New York, when the already established facts by affidavit have evidenced that I am Not a member of, citizen of, franchisee of, or resident (agent) of the corporate State of New York or the federal United States.

I, *Ibrahim Annan* _____ , am Not effectively connected with a trade or business in the corporate monopoly of the United States government, whether federal, State, county or municipal. I am Not a resident "U.S. citizen," but a citizen of the several States domiciled in the sovereign state of New York Republic (1859), an American (state) citizen of the united states of America. I am domiciled in a foreign jurisdiction to both the corporate state and federal governments. I have Not knowingly or willingly waived Any of my Unalienable Rights. American case law has clearly adjudicated that:

*"The right of the citizen to travel upon the public highways and to transport his/her property thereon either by carriage or automobile, is not a mere privilege which a city (or State) may prohibit or permit at will, but a common right which he/she has under the right to life, liberty, and the pursuit of happiness."*
—*Thompson v Smith, 154 SE 579*

*Even the legislature has no power to deny to a citizen the right to travel upon the highway and transport his/her property in the ordinary course of his business or pleasure, though this right may be regulated in accordance with the public interest and convenience."*
*("regulated" means traffic safety enforcement, stop lights, signs, etc.)*
—*Chicago Motor Coach v. Chicago, 169 NE 22*

Therefore, I *Ibrahim Annan* _____ , have determined and hereby affirm by affidavit and under oath, by virtue of my declared sovereign (state) citizenship and American case law, that I am Not required o have government permission to travel, Not required to have a driver's license, Not required to have vehicle registration of my personal property, nor to surrender the lawful title of my duly conveyed property to the State a security against government indebtedness and undeclared federal bankruptcy. Any administrative rule, regulation or statutory act of Any State legislature of judicial tribunal to the contrary is unlawful and clearly unconstitutional, thus Null and Void. American case law has clearly adjudicated that:

*"Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them."* — *Miranda v Arizona, 384 U.S.*

*"The claim and exercise of a constitutional right cannot be converted into a crime."*
—*Miller v. U.S., 230 F 2d 486, 489*

*"There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights."*
—*Sherar v. Cullen, 481 F. 945*

Affidavit: Right To Travel
Page 2 of 3

Any action involving a citation or ticket issued, confiscation, impoundment of search and seizure of my private property by a police officer or Any other public servant or employee which carries a fine of jail time is a penalty or sanction, thus converting a right into a crime. Any citation or ticket is thus Null and Void. Under every circumstance without exception, government officials must hold the Constitution for the United States (1791) supreme over Any other laws, regulations or orders. Every police (executive) officer or judicial officer has sworn an oath to protect the lives, property and rights of the citizens of the united states of America under the supreme law of the land. Any act to deprive (state citizens of their constitutionally protected rights is a direct violation of their oath of office, a felony and a federal crime.

> "The Senators and Representatives before mentioned, and the Members of the several state Legislatures, and all executive and judicial officers, both of the United States and the several states, shall be bound by Oath or Affirmation, to support this Constitution;"
> —U.S. Constitution, Article 6

Any action by a police (executive) officer, officer of the court, public servant or government official to assert unlawful authority under the "color of law" will be construed as a direct and willful violation of my constitutionally protected rights, and will be prosecuted to the full extent of American law.

> "Public officials are not immune from suit when they transcend their lawful authority by invading constitutional rights." —AFLCIO v. Woodward, 406 F2d 137 t.

> "Whoever under the color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any state, Territory, or District to the deprivation of Any rights, privileges or immunities secured or protected by the Constitution of laws of the United States...shall be fined not more than $1,000 or imprisoned not more than one year, or both..."
> —18 USC 242

This Affidavit also certifies that I, __IbRAHIM AmmAN__ have previously completed and passed a test measuring my competency to safely control a motorized vehicle upon the public highways within the united states of America. I have also met or exceeded all common sense requirements concerning the "rules of the road" and the ability to maneuver a motorized vehicle in a safe and responsible manner.

Pursuant to Title 28, USC 1746 (1) and executed "without the United States," I affirm under penalty of perjury under the laws of the united states of America that the foregoing is true and correct, to the best of my belief and informed knowledge and Further deponent saith not. I now affix my signature and official seal to all of the above affirmations with Explicit Reservation of All of My Unalienable Rights, Without Prejudice to any of those rights pursuant to UCC 1-207 and UCC 1-103.6.

Respectfully,

_IbRAHIM AmAN / Ibrahim annan_

Citizen/Principal, by Special Appearance, in Propia Persona, proceeding Sui Juris, with Assistance. Special Sworn, subscribed, sealed and affirmed before me this ___9___ day of _____ 2004.

Notary Public for New York _____
My commission expires _____

JOSE PACHECO
Notary Public, State of New York
No. 24-4624782
Qualified in Richmond County
Commission Expires Feb. 28, 20__ 7

STATE OF NEW YORK    **ss**:
COUNTY OF RICHMOND

**26491**

     I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that _Diane Mule_

whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal

this _2a_    day of _May_ 20 _12_

COUNTY CLERK

County Clerk and Clerk of the
Supreme Court, Richmond County

---

STATE OF NEW YORK    **ss**:
COUNTY OF RICHMOND

**26486**

     I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that _Diane Mule_

whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal

this _29_    day of _May_ 20 _12_

County Clerk and Clerk of the
Supreme Court, Richmond County

COUNTY CLERK

Ibrahim ANNAN
800 Victory Blvd #3V Date 2/01/2012
Staten Island, New York 10301

# RIGHT TO Travel   including copy

① This right to travel Affidavit Signed, and Notorized 9/9/2004 is the American case Law of the Land. Signed, and Notorized by Mr. Jose Pacheco for sign Ibrahim Annan

② This right to Travel Affidavit Authenticate 2/3/2011 is the valid Law of the Land in the year 2/01/2012

③ There is a one million dollar Fine for ORDERS

without Prejudice / ucc1-207.4 ucc1-303

Sign ucc1-308 Ibrahim annan ucc1-103.6 Date 2/01/2012

Swan to before me on February 1 2012

Notary Diane Mule   Date 2/1/12

DIANE MULE
Notary Public, State Of New York
No. 04MU6080480
Qualified in Richmond County
Commission Expires September 16, 20 14



**CIVILIAN COMPLAINT REVIEW BOARD**
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

JOAN M. THOMPSON
EXECUTIVE DIRECTOR

December 21, 2011

Mr. Ibrahim Annan
800 Victory Boulevard 1W
Staten Island, NY 10301

Re: CCRB case number 201106429

Dear Mr. Annan:

Following a thorough and impartial investigation by the Civilian Complaint Review Board's investigative staff, the Board reviewed the evidence regarding the above-referenced complaint. I am now writing to inform you of the Board's findings on the allegation(s) raised by this complaint.

Allegation(s) by letter :                                          Board finding(s) :

A)      Force:
        Det. James Rose used physical                    Substantiated (Charges)
        force against Christopher Gittens.

B)      Abuse of Authority:
        Det. Bert Grant searched the property            Substantiated (Command Discipline)
        of Ibrahim Annan and Christopher Gittens.

For an explanation of Board findings, please refer to the enclosed form, which details what each finding means.

In this case, the Board substantiated one or more allegations raised by the complaint. Under New York City law, the Civilian Complaint Review Board has the authority to investigate certain types of complaints against police officers, make findings of fact, and forward its recommendations to the Police Commissioner. Only the Police Commissioner has the authority to actually impose discipline against a police officer. Consequently, the CCRB is forwarding this case to the Police Commissioner and the Department Advocate's Office of the New York City Police Department, which is responsible for prosecuting administrative charges against police officers. Please be aware that in certain cases police officers are entitled by law to an administrative hearing before the Department can impose disciplinary penalties; in such a case you may be asked by the Department Advocate's Office to testify at an administrative proceeding.



# CIVILIAN COMPLAINT REVIEW BOARD
**40 RECTOR STREET, 2ND FLOOR**
**NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833**
**www.nyc.gov/ccrb**

MICHAEL R. BLOOMBERG
MAYOR

JOAN M. THOMPSON
EXECUTIVE DIRECTOR

December 21, 2011

Mr. Timothy Hampton
110 Tompkins Circle
Staten Island, NY 10301

Re: CCRB case number 201106429

Dear Mr. Hampton:

Following a thorough and impartial investigation by the Civilian Complaint Review Board's investigative staff, the Board reviewed the evidence regarding the above-referenced complaint.  I am now writing to inform you of the Board's findings on the allegation(s) raised by this complaint.

Allegation(s) by letter :                               Board finding(s) :

A)      Force:
        Det. James Rose used physical              Substantiated (Charges)
        force against Christopher Gittens.

B)      Abuse of Authority:
        Det. Bert Grant searched the property      Substantiated (Command Discipline)
        of Ibrahim Annan and Christopher Gittens.

For an explanation of Board findings, please refer to the enclosed form, which details what each finding means.

In this case, the Board substantiated one or more allegations raised by the complaint.  Under New York City law, the Civilian Complaint Review Board has the authority to investigate certain types of complaints against police officers, make findings of fact, and forward its recommendations to the Police Commissioner. Only the Police Commissioner has the authority to actually impose discipline against a police officer.  Consequently, the CCRB is forwarding this case to the Police Commissioner and the Department Advocate's Office of the New York City Police Department, which is responsible for prosecuting administrative charges against police officers.  Please be aware that in certain cases police officers are entitled by law to an administrative hearing before the Department can impose disciplinary penalties;  in such a case you may be asked by the Department Advocate's Office to testify at an administrative proceeding.



**CIVILIAN COMPLAINT REVIEW BOARD**
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

JOAN M. THOMPSON
EXECUTIVE DIRECTOR

## EXPLANATION OF BOARD FINDINGS

**Exonerated** - the officer's actions were permitted.

**Miscellaneous** - the officer has left the police department.

**Officer Unidentified** - it is unclear who committed the alleged misconduct.

**Substantiated** - the officer committed misconduct.*

**Unfounded** - the officer did not do what was alleged.

**Unsubstantiated** - it is unclear whether misconduct occurred.

If you have new evidence, not previously available to the CCRB, or a previously unavailable or uncooperative witness becomes available, the Board may be willing to reopen your case if such new evidence may reasonably lead to a different finding. To request that the Board reopen your case in such circumstances, please detail the new evidence and request in a letter addressed to Graham Daw, Agency Counsel, at the above address, as soon as possible.

---

*The Board may, when it substantiates an allegation, make one of the following recommendations:
Instructions: The officer should receive instructions as to how the situation should have been handled.
Command discipline: The officer should receive discipline at the local, command level, which may range from instructions to the loss of up to ten days' pay.
Charges and specifications: Charges should be filed against the officer, which may result in an administrative hearing and a penalty more severe than a command discipline.

*Rose*

# Complaint Report (CCRB)

| | | | |
|---|---|---|---|
| **CCRB Case No :** | 201109907 | **C/V Report Date :** Thu, 05/12/2011  06:22 PM | |
| **Complaint Type :** | IAB | **Investigator :** | Not Assigned |
| **Complaint Made At :** | CCRB | **Ref. No :** | 11-21688 |
| **Received Date (CCRB) :** | Wed, 05/18/2011  02:51 PM | **Mode :** | Phone |
| **Incident Date :** | Thu, 05/12/2011  05:30 PM | **Location :** | Street/highway |
| **Place of Occurrence :** | 244 Richmond Terrace | **Precinct :** | 120 |
| | | **Boro :** | Staten Island |

**Reason for Initial Contact :** Other

**Charges :**         Arrest - OGA

## Complainant/Victim Details

| | | | |
|---|---|---|---|
| **Name :**<br>**Address :** | Ibrahim Annan<br>800 Victory Boulevard, 1W Staten Island NY 10301, USA | **Type :** Comp/Victim | |
| **Contacts :** | | (646)-372-0771 Phone(Mobile) | |
| **Gender :**<br>**Person Assisting :**<br>**Injury Details :** | Male | **Ethnicity :** Black | **Date of Birth :** 06/11/1972 |
| **Name :**<br>**Address :** | Christopher Gittens<br>244 Richmond Terrace Staten Island NY 10301, USA | **Type :** Comp/Victim | |
| **Contacts :** | | (646)-363-2781 Phone(Mobile) | |
| **Gender :**<br>**Person Assisting :**<br>**Injury Details :** | Male | **Ethnicity :** Black | **Date of Birth :** 09/02/1977 |

## Officer(s) Named in Complaint

| Rank | Officer | S/W Officer | Tax No | Race | Cmd Allegations/Board Dispositions |
|---|---|---|---|---|---|
| DT3 | James Rose | Subject Officer | 903216 | Black | 229 |
| DT2 | Bert Grant | Subject Officer | 904583 | Black | 229 |
| DT3 | Michael Bonanno | Witness Officer | 927942 | White | 229 |
| SGT | Christophe Lawrence | Witness Officer | 893267 | White | 229 |

# Complaint Report (CCRB)

## Initial Complaint Narrative

This is a CCRB spin-off of case number 201106429.

05/13/11*** THE ORIGINAL LOG # 11-21537 WAS ASSESSED AS "OG". THIS IS A SPIN OFF
CCRB***FADO-UNNECESSARY FORCE***

05/12/11 @1822HRS,Mr. Annan states that that the Missing Person Unit was looking for Mr Annan and told him he
needs to go with them. Mr. Annan states that the Missing Person Unit wanted Mr. Annan to go and take a lie detector
test so that they could scratch his name off of the list. Mr. Annan states that the officers snatched his friend out of the
car and beat him up. Mr. Annan states that he video taped the incident with his cell phone and the officer took his phone
and erased everything. Mr. Annan states that he and Christopher Gettons and Timothy Hampton were riding in the car
together                                          Gittens  11/30/2011

## Witness

| | |
|---|---|
| **Name of Witness :** | Timothy Hampton |
| **Address :** | 110 Tompkins Circle Staten Island NY 10301, USA |
| **Contacts :** | |

| | | | | | |
|---|---|---|---|---|---|
| **Gender :** | Male | **Ethnicity :** Unknown | **DO Birth :** 08/12/1971 | | |

If you have any questions about the current status of your case at the Police Department, please contact Hiram Lopez at (646)-610-5483.  Mr. Lopez is the chief of the unit at the Department Advocate's Office assigned to prosecute cases substantiated by the Civilian Complaint Review Board.

The integrity and quality of the Police Department's service to the public depends, in large part, upon receiving information regarding the performance of police officers as they carry out their duties.  The Civilian Complaint Review Board appreciates your willingness to participate in this extremely important process.

Sincerely,

Joan M. Thompson
Executive Director

Enclosure

## RIGHT TO TRAVEL (Affidavit 4)

State of New York
County of Richmond

RICHMOND COUNTY CLERK

RECORDING REQUESTED BY:   2011 FEB -3  P 1: 07

RECEIVED COURT DESK

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

AFFIDAVIT: Right to Travel

## AFFIDAVIT: Right to Travel

Know All men and Women By these Presents, that I, *IbrAHIm Annan*
Being First Duly Sworn, deposes and says:

STATE OF NEW YORK
COUNTY OF RICHMOND _____ ss:

24639

I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that *Jose Pacheco* whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

this  3rd   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal
day of  Feb.  20 11

_____
County Clerk and Clerk of the
Supreme Court, Richmond County

commerce, therefore, it is Not a "motor vehicle." The corporate State of New York Department of Motor Vehicle code does not disclose the true intent and purpose of the statutes, though a "motor vehicle" is adequately and clearly defined in the United States Code (USC).

> "*Motor Vehicle* means every description of carriage or other contrivance propelled or drawn by mechanical power and used for commercial purposes." —18 USC 31

Affidavit: Right To Travel
Page 1 of 3

of My Unalienable Rights, Without Prejudice to any of those rights pursuant to UCC 1-207 and UCC 1-103.6.

Respectfully,

*IbrAHIm Annan / Ibrahim annan*
Citizen/Principal, by Special Appearance, in Propia Persona, proceeding Sui Juris, with Assistance, Special Sworn, subscribed, sealed and affirmed before me this _____9_____ day of _____ 2004.

_____
Notary Public for New York
My commission expires _____

JOSE PACHECO
Notary Public, State of New York
No. 24-4624782
Qualified in Richmond County
Commission Expires Feb. 28, 2007

Ibrahim Annan
800 Victory Bl#3V
Staten Island, New York 10301

With Every order There
is A Bill The fee
for order's of Ibrahim
Annan IS 7,000.000.00 Dollars

Sign in ucl-308 _Ibrahim_ ucc1-207.4  Date  01/25/2012

Sworn Before me on
January 25, 2012 Before me
came (i) Annan Ibrahim

Anna Ferrara

ANNA FERRARA
Notary Public, State of New York
No. 04FE6058186
Qualified in Richmond County
Commission Expires May 7, 20 15

Notary Sign :                    Date :

STATE OF NEW YORK
COUNTY OF RICHMOND            ss:

26055

I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that **Anna Ferrara** whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 25th day of Jan 20 12 .

County Clerk and Clerk
Supreme Court, Richmond County

## Affidavit of reservation of rights UCC 1-308/1-207
# Sovereign Authority

**PUBLIC**
**THIS IS A PUBLIC COMMUNICATION TO ALL**
Notice to agents is notice to principles
Notice to principles is Notice to Agents

Applications to all successors and assigns
All are without excuse

Ibrahim Annan, sui juris
All rights reserved **UCC 1-308/1-207**
c/o Address
Staten Island, New York a republic near
[10301]
Phone: [ XXX XXX-XXXX ]
**Non-domestic without the United States**

Let it be known to all that I, **Ibrahim Annan** explicitly reserves all of my rights. See **UCC 1-308** which was formally **UCC 1-207**.

**"§ 1-308. Performance or Acceptance Under Reservation of Rights.**
**(a) A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest," or the like are sufficient."**
I retain all of my rights and liberties at all times and in all places, **nunc pro tunc** (now for then) from the time of my birth and forevermore. Further, I retain my rights not to be compelled to perform under any contract or commercial agreement that I did not enter knowingly, voluntarily and intentionally. And furthermore, I do not accept the liability of the compelled benefit of any unrevealed contract or commercial agreement. I am not ever subject to silent contracts and have never knowingly or willingly contracted away my sovereignty.

Further, I am not a United States citizen or a 14th amendment citizen. I am a State Citizen of the republic and reject any attempted expatriation. See **15 united States statute at large, July 27th, 1868** also known as the expatriation statute.

Violation fee of my liberty is $250,000 per incident or per 15 minutes or any part thereof. Wherefore all have undeniable knowledge.

*Sovereign Authority*

## AFFIDAVIT
Affiant, **Ibrahim Annan**, sui juris, a natural born Citizen of **New York** in its dejure capacity as a republic and as one of the several states of the union created by the constitution for the united States of America 1777/1789. This incidentally makes me an American national and a common man of the Sovereign People, does swear and affirm that Affiant has scribed and read the foregoing facts, and in accordance with the best of Affiant's firsthand knowledge and conviction, such are true, correct, complete, and not misleading, the truth, the whole truth, and nothing but the truth.
Signed By: ucc 1-2074 Ibrahim Ann ucc 1-103.6 sui juris, This Affidavit is dated_____

### NOTARY PUBLIC
State ucc 1-2074 Ibrahim annan ucc 1-103.6 County _____
Subscribed and sworn to before me, a Notary Public, the above signed **Ibrahim Annan**,
This ____9th____ day of ___December 2011_____ year

CLH
1/25/12

Notary Public _____
MY COMMISSION EXPIRES: _____

MARIA A. RICCARDI
Notary Public, State of New York
No. 04Hi6000794
Qualified in Richmond County
My Commission Expires December 22, 2013

**STATE OF NEW YORK**    ss:
**COUNTY OF RICHMOND**

25941

I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that Maria a. Riccarda whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal
this ___9___ day of ___Dec___ 20 _11_

County Clerk and Clerk of the

**NOTICE**

**FEE SCHEDULE FOR SPECIAL APPEARANCE**

1) That the fee for a special appearance of Ibrahim Annan is $500,000.00 and
2) Each instance of copyright infringement wherein this registered trademark is spoken or publicly displayed the fee is impose

Name UCC-207.4 Ibrahim Annan ucc-103,6 Date  12/9/11

Sworn before me on this 9th day of December 2011

Notary Puplic Maria A Riccardi

RECEIPT-55641                    DATE-12/09/2011
DRAWER: 03                       TIME- 13:46:52
USER:   FTALJA0000

RICHMOND COUNTY CLERK
HON. STEPHEN J. FIALA
COMMISSIONER

MARIA A. RICCARDI
Notary Public, State of New York
No. 04Hi6000794
Qualified in Richmond County
My Commission Expires December 22, 2013

| DOC. NUMBER | TYPE | REMARKS | AMOUNT |
|---|---|---|---|
| 1034430 09-AUTHENTICATION | | 25941-25942 | 3.00 |
| TOTAL FOR 1034430 | | | 3.00 |
| 1034431 09-AUTHENTICATION | | 25941-25942 | 3.00 |
| TOTAL FOR 1034431 | | | 3.00 |
| TOTAL ALL DOCUMENTS | | | 6.00 |
| CASH: | | | 6.00 |

TOTAL COLLECTED
THANK YOU & HAVE A NICE DAY
STEPHEN J. FIALA

STATE OF NEW YORK        ss:
COUNTY OF RICHMOND

**25942**

I STEPHEN J. FIALA, County Clerk and Clerk of the Supreme Court, Richmond County, a Court of Record having by law a seal, DO HEREBY CERTIFY that *Maria a · Riccardi*

whose name is subscribed to the deposition, oath, certificate of acknowledgment or proof of the annexed instrument, was at the time of taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, power of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State, to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such NOTARY PUBLIC, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal

this    9    day of Dec   20 11

County Clerk and Clerk of the