UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
IBRAHIM ANNAN,

                       Plaintiff,

                  -against-

CITY OF NEW YORK POLICE
DEPARTMENT, et al.,

                       Defendants.
---------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-2702 (CBA)(CLP)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E D N Y.
★ SEP 18 2015 ★
BROOKLYN OFFICE

**AMON, Chief United States District Judge:**

    Plaintiff Ibrahim Annan brings this pro se action pursuant to 42 U.S.C. § 1983 against the New York City Police Department ("NYPD"), the NYPD Missing Persons Squad, former Mayor Michael R. Bloomberg, former NYPD Commissioner Raymond W. Kelly, NYPD Detectives James Rose, Bert Grant, Eddie Maldonado, and an unidentified Officer "Albeck" or "Alback" (collectively, "defendants"). Annan alleges that his constitutional rights were violated during interactions with the Missing Persons Squad on four separate occasions: January 23–24, 2010; January 27, 2010; May 12, 2011; and January 12, 2012. Annan now seeks judgment on the pleadings, partial summary judgment, and entry of default against all defendants. (D.E. # 107, 121.) Defendants in turn seek summary judgment on all of Annan's claims except those against Detectives Grant and Rose arising from the January 27, 2010 incident (the "January 27 claims"). (D.E. # 114.) Those motions were referred to the Honorable Cheryl L. Pollak, United States Magistrate Judge, for Report and Recommendation ("R&R").

    Now before the Court is Magistrate Judge Pollak's comprehensive R&R recommending that Annan's motions for partial summary judgment, judgment on the pleadings, and entry of default be denied, and that defendants' motion for partial summary judgment be granted in part and denied in part. Specifically, the R&R recommends that the following claims be dismissed:

1

(1) all claims against the NYPD, the Missing Persons Squad, former Mayor Bloomberg, former Commissioner Kelly, and Detective Maldonado; (2) the false imprisonment claim against Officer "Albeck" or "Alback," who remains unidentified,[1] arising from the January 23–24 incident; (4) the false imprisonment and deprivation of property claims stemming from the May 12 incident; and (5) all state law claims. The R&R recommends denying summary judgment as to Annan's claim that he was illegally frisked by Detectives Rose and Grant during the course of the May 12 incident ("the frisk claim"). Magistrate Judge Pollak thus recommends that the Court allow the frisk claim to proceed, along with the January 27 claims, as to which defendants did not seek summary judgment. (R&R at 49.) For the reasons set forth below, the Court now adopts the recommendations of the R&R, with the following modifications and additional discussion regarding the frisk claim and other claims arising from the May 12 incident.

## BACKGROUND

The Court assumes familiarity with the facts and background of the case as set forth in the R&R, (see R&R at 2–11), but briefly recounts those facts relevant to the May 12 encounter between Annan and the NYPD.

On May 12, 2011, Detectives James Rose and Bert Grant sought out Annan at his home in Staten Island in connection with an ongoing missing person investigation. (See Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Defs.' R. 56.1"), D.E. # 116 ¶ 31.) Annan's parents called to inform him that the detectives were at his apartment and refused to leave until he arrived. (Decl. of Uriel B. Abt in Supp. of Defs.' Mot. for Partial Summ. J. ("Abt Decl."), Exhibit B, Excerpts of Deposition of Ibrahim Annan ("Annan Dep.") at 113:6–17, 114:3–5.) Annan told his parents that he would come back to the apartment. (Id. at 114:1–2.) Approximately 15 minutes

---

[1] In his objections, Annan purports to have identified this individual as "Christopher Obdyke." (D.E. # 133 at 2.)

later, Annan arrived and saw two police cars in the driveway in front of his apartment building. (Id. at 116:6–24; 297:7–14.) While Timothy Hampton, who was driving the vehicle in which Annan was traveling, waited for an opening in traffic to turn into the driveway, the police cars pulled out, so Annan asked Hampton to "proceed and pursue them so I can go see what's happening and what they came to discuss with my mother and father." (Id. at 297:7–14; 297:23–298:7; see also Defs.' R. 56.1 ¶ 32 (not finding Annan at home, the detectives departed for the precinct).)

Approximately two or three minutes later, Annan saw the detectives standing outside their car on the corner, and asked Hampton to pull over. (Annan Dep. at 298:14–22.) The detectives did not know the two individuals who were with Annan when he pulled up in a 1995 Chevy Caprice Classic with a flood light attached to the driver's door ("the Chevy"). (Defs.' R. 56.1 ¶¶ 33–35.) Annan and an individual later identified as Christopher Gittens exited the vehicle and approached Detective Grant. (Id. ¶ 36.) Annan asked the detectives if they were looking for him and what they wanted. (Id. ¶ 37; Complaint ("Compl."), D.E. # 1, at 12; Annan Dep. at 300:18–19, 310:3–4.) The detectives told Annan that they wanted to him to take a polygraph test. (Defs.' R. 56.1 ¶ 37.) Annan declined, informing the detectives that he did not want to go anywhere with them, and asked that they stop coming to his house. (Annan Dep. at 310:3–7.)

While Annan and the detectives were speaking, Gittens was reporting the conversation into a cellphone. (Id. ¶ 39; Compl. at 13.) Gittens claimed that he was speaking to a police "officer," (Compl. at 13), but would not permit the officers to speak to the person on the phone, (Defs.' R. 56.1 ¶ 39). Detective Grant eventually told Annan that he could leave, (Annan Dep. at 312:1–12), so Annan and his companions returned to the car and drove away, (id.; Defs.' R. 56.1 ¶ 39). Detectives Rose and Grant made no effort to stop them. (Annan Dep. at 312:3–8; Defs.' R. 56.1 ¶ 39.) After conferring with their supervisor, Sergeant Lawrence, the detectives followed the

Chevy, hoping for an opportunity to speak to Annan alone. (Defs.' R. 56.1 ¶ 41.) After several minutes, the officers pulled over the Chevy when Hampton changed lanes without signaling. (Id. ¶¶ 42–43.) After Sergeant Lawrence arrived on the scene, the officers approached the car. (Id. ¶ 44.)

Here, the accounts of the parties dramatically and critically diverge. Defendants allege that Sergeant Lawrence approached the Chevy's front passenger side, where Gittens was sitting, and ordered him to exit the vehicle. (Id. ¶ 45.) Defendants contend that when Gittens refused to exit the vehicle, "a struggle ensued" between Gittens and Detective Rose, which ultimately led to Gittens' arrest. (Id. ¶ 46.) The officers also claim that throughout this interaction, Gittens was making strange comments that led Detective Rose to believe he "might be an emotionally disturbed person." (Id. ¶ 47.)

By contrast, Annan alleges that Detective Rose demanded that Gittens get out of the car. (Compl. at 13.) Annan claims that Gittens "kindly responded that he was a traveler," and asked the officers to instead engage with Hampton, the driver. (Id.) According to Annan, the detectives then started punching Gittens through the car window. (Annan Dep. 325:6–14.) Detective Rose then forcibly removed Gittens from the car and "savagely beat" him. (Compl. at 13.) Annan claims to have recorded a video of the entire incident on his cellphone ("the video"). (Id. at 13–14.)

After the detectives "finish[ed] stomping [Gittens] and kicking him and dragged him across with [] handcuffs," (Annan Dep. at 344:20–24), Annan was ordered out of the vehicle, and subjected to a "pat frisk," (Compl. at 13–14; Defs.' R. 56.1 ¶¶ 48–49). The parties agree that the officers then "collected" identification and cellphones from both Annan and Hampton, (Defs.' R. 56.1 ¶ 50), although the surrounding circumstances are disputed. Annan contends that the

detectives "demanded" his phone and took it. (Compl. at 14 ("Detective Grant then demanded Ibrahim Annan['s] personal private property. . . ."); Annan Dep. at 358:23–24 ("[H]e took the phone, yeah, after he demanded and commanded the phone from me, yes.").) Annan claims that Detective Grant then erased the video, (Compl. at 13–14), which defendants deny, (Defs.' R. 56.1 ¶ 55).

Based on these facts, Magistrate Judge Pollak liberally construed Annan's complaint as asserting the following section 1983 claims arising from the May 12 incident: (1) false imprisonment; (2) illegal search (the frisk); and (3) deprivation of property (the cellphone). Magistrate Judge Pollak recommended that summary judgment be granted as to the false imprisonment and deprivation of property claims, but denied with respect to the unlawful search claim because material factual disputes remained as to the circumstances surrounding the frisk. (R&R at 26–30, 39–40.)

## STANDARD OF REVIEW

When deciding whether to adopt a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). To accept those portions of the R&R to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." Jarvis v. N. Am. Globex Fund, L.P., 823 F. Supp. 2d 161, 163 (E.D.N.Y. 2011) (internal quotation marks and citation omitted). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).

Both Annan and defendants filed timely objections to the R&R. (Annan's Objections ("Annan Obj."), D.E. # 133; Defendants' Objections ("Defs.' Obj."), D.E. # 132.) Defendants

objected only to that portion of the R&R recommending denial of summary judgment on Annan's frisk claim. (Defs.' Obj. at 2.) Specifically, defendants contend that they are entitled to summary judgment on the frisk claim on two grounds: (1) the frisk was reasonable as a matter of law; and (2) Detectives Rose and Grant are entitled to qualified immunity for any claims stemming from the frisk. (Id.)

Annan filed lengthy objections, as well as a response to defendants' objections, (Annan's Response to Defendants Objections ("Annan Resp."), D.E. # 134). In these submissions, Annan raises two specific arguments related to the alleged confiscation of his cellphone and the deletion of the video. First, Annan contends that the warrantless search and seizure of his cellphone was unconstitutional. (See Annan Obj. at 6, 25.) Second, Annan argues that the seizure of his cellphone and deletion of the video violated his First Amendment right to film police officers. (See id. at 10, 15, 37–38, 51–52.) The Court understands Annan to be asking that the Court construe these factual allegations as giving rise to section 1983 claims for deprivations of Annan's First and Fourth Amendment rights. The Court addresses this request below.

Annan purports to raise a number of other objections, which are either too general or plainly meritless.[2] Although the Court is mindful that "[t]he objections of parties appearing pro se are generally accorded leniency," Williams v. Woodhull Med. & Mental Health Ctr., 891 F. Supp. 2d 301, 310 (E.D.N.Y. 2012) (internal quotation marks and citations omitted), "even a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal," Brown v. Smith, No. 09-CV-4522, 2012 WL 511581, at *2 (E.D.N.Y. Feb. 15, 2012) (quoting Pinkney v. Progressive Home Health Servs., No. 06-CV-5023, 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008)). Nevertheless, in light of Annan's pro se status

---

[2] For example, Annan raises claims based on Title 18 of the United States Code, the Uniform Code of Military Justice, and the Uniform Commercial Code.

and in the interests of abundant caution, the Court has reviewed the R&R de novo. The Court now adopts the recommendations set forth in the R&R, with the following modifications and additional discussion regarding the claims arising from the alleged frisk and cellphone confiscation.

## DISCUSSION

Summary judgment is only appropriate if the moving party carries its burden of showing the absence of a genuine issue of material fact. See Fed. R. Civ. P. 56; Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1223 (2d Cir. 1994) ("The burden of establishing that there are no issues of material fact lies with the moving party."). The Court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In evaluating whether the moving party has met this burden, the Court must view the evidence in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970). The nonmoving party cannot rest on mere allegations or denials, Fed. R. Civ. P. 56(e); Nat'l Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987), but all "[a]mbiguities or inferences to be drawn from the facts must be viewed in a light most favorable to" that party, Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir. 1983). Ultimately, summary judgment should be denied unless no "reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Magistrate Judge Pollak concluded that material factual disputes preclude summary judgment on Annan's frisk claim and recommended that the Court deny summary judgment. After de novo review of the relevant portion of the R&R, the Court agrees for the reasons set forth below. The Court accordingly denies summary judgment on the frisk claim and allows that claim to

proceed. In addition, as discussed below, the Court will also permit two additional claims arising from the confiscation of Annan's cellphone and the deletion of the video to go forward.

## I. Reasonableness of the Frisk

A frisk is constitutionally permissible if law enforcement officers "reasonably suspect that the person stopped is armed and dangerous."[3] Arizona v. Johnson, 555 U.S. 323, 326–27 (2009) (citing Terry v. Ohio, 392 U.S. 1 (1968)); see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) ("[P]olice may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous."). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27.

Whether the police reasonably believed an individual was armed and dangerous must be assessed under "the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (quoting United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000)). Although the standard is "not high," id., courts do "not merely defer to the police officer's judgment," Bayless, 201 F.3d at 133. Instead, law enforcement officers "must be able to point to particular facts from which [they] reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968); see also United States v. Vasquez, 638 F.2d 507, 520–21 (2d Cir. 1980) (police officer "may not 'frisk' [an] individual if he has no articulable grounds for fearing danger").

Defendants contend that frisking Annan was reasonable as a matter of law because, under the totality of the circumstances, Detectives Rose and Grant reasonably suspected that Annan was

---

[3] Although the R&R refers to "probable cause" in assessing whether the frisk was reasonable, (Defs.' Obj. at 7), the Court has reviewed the legal issue de novo and applies the "reasonable suspicion" standard here.

8

armed and dangerous. Defendants rely on the following facts to argue that frisking Annan was justified:

- That Annan followed the detectives;
- That two other people were in the vehicle Annan arrived in;
- That Annan and his companions pulled up in an old Chevy sedan with a flood light attached to the door;
- That Gittens reported the conversation between Annan and the detectives into a cellphone to a person he claimed was an "officer," but would not let the detectives talk to that person;
- That Annan refused to submit to a polygraph test;
- That Gittens refused to exit the vehicle;
- That a physical struggle then ensued between Gittens and Detective Rose; and
- That, throughout the encounter, Gittens was making strange comments.

(Defs.' Obj. at 8–10; Defs.' R. 56.1 ¶ 47.)

Pointing to these facts, defendants argue that Gittens' refusal to exit the Chevy, and the physical altercation which ensued, created a hostile and escalating situation in which the detectives reasonably feared for their safety. Defendants contend that this fear was heightened by the fact that Annan and his companions had been "imitating law enforcement" by following the detectives and questioning them, arriving in a type of vehicle frequently used by law enforcement with a floodlight affixed to the door, and reporting the conversation between Annan and the detectives to an "officer" on the phone. Based on this behavior, defendants contend that it was reasonable to believe that the vehicle's occupants were also mimicking law enforcement by carrying weapons. (Defs.' Obj. at 8–10.)

The events leading up to the frisk are disputed, however. Specifically, Annan contends that after stopping the vehicle, Detective Rose opened the front passenger door and demanded that Gittens get out of the car. (Compl. at 13.) When Gittens "kindly responded that he was a traveler," Annan claims that the detectives started punching Gittens through the car window. (Annan Dep. 325:6–14). Detective Rose then forcibly removed Gittens from the car and "savagely beat" him. (Compl. at 13.) These conflicting accounts describe encounters of dramatically different tenor: on the one hand, a swiftly developing situation in which the Chevy's occupants instigated a physical struggle with the detectives; on the other, a brutal and unprovoked beating of one passenger, followed by the frisk of another. Determining which, if either, of these starkly contrasting scenarios confronted the detectives requires a credibility determination, which cannot be resolved by the Court at the summary judgment stage. See Floyd v. City of New York, 813 F. Supp. 2d 417, 445–46 (S.D.N.Y. 2011) (denying summary judgment on claim that stop and frisk violated Fourth Amendment where reasonableness of the search "turn[ed] on a credibility determination, which is beyond the purview of a court deciding a summary judgment motion").

The other facts that defendants identify to justify frisking Annan all involve the earlier encounter between Annan and the detectives. Even if the Court was inclined to credit defendants' contention that (1) seeking out the police to find out what they wanted, (2) driving a sedan with a light attached to it, and (3) talking on a cellphone to an "officer" constituted suspicious behavior suggesting that Annan was armed and dangerous,[4] the Court agrees with Magistrate Judge Pollak

---

[4] To the extent that the detectives claim they reasonably believed Annan was armed and dangerous because of the manner in which he initially approached them, (Defs.' Mem. at 23–24), that argument is undermined by the fact that the detectives did not frisk Annan during that first encounter—when they claim he confronted them in a "show of force," (Defs.' Mem. at 24)—and instead waited until they themselves later initiated a second interaction (with reinforcements). See Floyd v. City of New York, 813 F. Supp. 2d 540, 650 (S.D.N.Y. 2013), appeal dismissed (Sept. 25, 2013) ("The officers did not appear to believe that [plaintiff] was armed and dangerous when they approached him, because they did not immediately frisk him."); United States v. Breedlove, 424 F. Supp. 2d 379, 386 n.9 (D. Conn. 2006) (finding that frisk of defendant was not justified, in part, because "the search of defendant was conducted after his arrest, not upon the first arrival of the officers [on the scene], suggesting that the officers had no such fear").

10

that these facts are susceptible to competing inferences. A reasonable jury could (perhaps) infer that the Chevy looked like a law enforcement vehicle or that Annan was "imitating law enforcement" in a way suggesting that he might be armed; however, "such an inference would be inappropriate on summary judgment, where all facts must be viewed in the light most favorable to [the nonmoving party]." Berbick v. Precinct 42, 477 F. Supp. 2d 268, 278 (S.D.N.Y. 2013) (denying summary judgment on frisk claim where reasonableness of search was not established by undisputed facts).

Although defendants claim that courts "have consistently held that there was reasonable suspicion to pat frisk automobile occupants who exhibited suspicious behavior comparable to that of Plaintiff and his friends," (Defs.' Obj. at 10–11), all of the cases defendants cite involved facts that are simply not evident here. For example, defendants do not offer any facts about the neighborhood where the encounter took place or the time of day. Cf. United States v. Thomas, 184 F. App'x 91, 91–92 (2d Cir. 2006) (finding reasonable suspicion to frisk defendant where "[t]he officers observed [the defendant] (and another man) in the early morning hours, in a high crime neighborhood, sitting in a rented van with tinted windows . . . the only vehicle parked on the street, on the wrong side of the street, with the engine running," and where the defendant "was acting suspiciously, he twitched about, stuttered, moved his hands nervously, rubbed his legs, licked his lips and looked around furtively"). Defendants do not claim to have seen Annan or the other Chevy occupants hide anything in their clothing or to have observed any suspicious bulges on their persons. Cf. United States v. Santillan, No. 13-CR-138 (RWS), 2013 WL 4017167, at *10 (S.D.N.Y. Aug. 7, 2013) (finding reasonable suspicion to frisk vehicle occupant based on his "nervous behavior" and inability "to answer valid answers to simple questions," coupled with the fact that another occupant had "an unknown bulge in [his] back [pants] pocket . . . was hesitant to

exit the [vehicle], and looked over his area where he was sitting before leaving the vehicle"). Nor do defendants contend that Annan made any furtive movements, was acting nervously or evasively, or fled from the police. Cf. United States v. Harris, No. 13-CR-556 (AJN), 2013 WL 6728136, at *5 (S.D.N.Y. Dec. 20, 2013) (finding reasonable suspicion to frisk vehicle occupants where "prior to the car stop, the officers had observed someone running quickly away from the car, suggesting to them that the person had been in some kind of danger," the officers "observed the Defendant turn away and make a movement suggesting that an object was being placed in the Defendant's clothing," the passengers were observed as "nervous, fidgety, and evasive," and the stop took place "in a high crime area"). To the contrary, there is no indication in the record that Annan behaved abnormally or did anything other than comply with the detectives' instructions.

Viewing the undisputed facts in the light most favorable to Annan and drawing all rational inferences in his favor, the Court cannot conclude that no reasonable jury could return a verdict for Annan. As such, the Court adopts the recommendation of Magistrate Judge Pollak and denies summary judgment as to Annan's frisk claim. See Anderson, 477 U.S. at 248.

## II. Qualified Immunity

Given the unresolved factual issues surrounding the events leading up to the frisk, the Court also agrees with Magistrate Judge Pollak's conclusion that Detectives Rose and Grant are not entitled to summary judgment on their qualified immunity defense.

"The doctrine of qualified immunity shields police officers from personal liability for damages for 'official conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Petway v. City of New York, No. 10-CV-1048 (ARR) (LB), 2012 WL 2254246, at * 6 (E.D.N.Y. June 14, 2012) (internal quotation marks and citation omitted) (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 127 (2d Cir.

12

1997)). To invoke this affirmative defense at the summary judgment stage, a defendant must prove entitlement to qualified immunity based on the undisputed facts, "viewed in the light most favorable to the plaintiff." See Rogoz v. City of Hartford, --- F.3d ---, No. 14-0876, 2015 WL 4716570, at *8 (2d Cir. Aug. 10, 2015) (emphasizing that qualified immunity is "an affirmative defense on which [the defendant asserting the defense] has the burden of proof . . . on a motion for summary judgment"). "[W]here material facts are disputed," however, " 'jury consideration is normally required.' " Petway, 2012 WL 2254246, at * 6 (quoting Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994)); see also Curry v. City of Syracuse, 316 F.3d 324, 334–35 (2d Cir. 2003) (summary judgment on qualified immunity "requires that no dispute about material factual issues remain").

Thus, Detectives Rose and Grant "would be entitled to summary judgment if the undisputed facts" demonstrated that "they reasonably could have believed the frisk was legal." Berbick, 977 F. Supp. 2d at 279 (citing Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007)). Accepting Annan's version of events, however, genuine issues of fact exist regarding not only the physical altercation between Gittens and the police, but also the manner in which Annan first approached and interacted with the detectives, and the inferences to be drawn therefrom. See Rogoz, 2015 WL 4716570, at *8–12 (vacating district court's award of summary judgment on qualified immunity, in part, because district court failed to view the record in the light most favorable to the nonmoving party by making "credibility determination[s]" and resolving competing inferences against that party). These material factual disputes call into question whether an objectively reasonable officer would believe that frisking Annan was lawful under the circumstances. "Where, as here, there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate." McKelvie

v. Cooper, 190 F.3d 58, 63 (2d Cir. 1999). Accordingly, defendants are not entitled to summary judgment on their qualified immunity defense. See Curry, 316 F.3d at 334–35 (vacating district court's award of summary judgment on qualified immunity where material facts "and what inferences could reasonably be drawn from" those facts remained disputed); Petway, 2012 WL 2254246, at *6 (denying summary judgment on qualified immunity claim because factual disputes remained "bear[ing] directly upon whether it was objectively reasonable for defendants to believe that they were acting lawfully").

### III. Additional Section 1983 Claims

Annan contends that after he was frisked, Detective Grant "demanded" his cellphone, and then erased a video on the cellphone that Annan had recorded of the altercation between Gittens and the police. (Compl. at 14.) Defendants concede that they "collected" Annan's cellphone, although they deny erasing anything. (Defs.' R. 56.1 ¶ 55.) Magistrate Judge Pollak construed these facts as stating a claim that the detectives deprived Annan of his property in violation of the Due Process Clause of the Fourteenth Amendment and recommended granting summary judgment on that claim. (R&R at 31–32.) The Court adopts Magistrate Judge Pollak's recommendation with respect to the deprivation of property claim. In his objections, however, Annan requests that the Court construe these facts as giving rise to two additional claims: (1) that the search and seizure of his cellphone violated the Fourth Amendment, and (2) that the search and seizure of his cellphone and subsequent deletion of the video deprived Annan of his First Amendment right to film the police officers. (See Annan Obj. at 6, 10, 15, 25, 37–38, 51–52.)

"It is well established that the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the strongest arguments they suggest.'" Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original) (quoting Pabon v. Wright, 459

F.3d 241, 248 (2d Cir. 2006)). As such, it is the task of the district court to determine what claims are raised by the allegations of a pro se litigant and, "[i]n so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings." Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005). If the facts alleged "give rise to at least a viable . . . claim," the district court should read the complaint as asserting that claim. Id. ("[P]ro se litigants . . . cannot be expected to know all of the legal theories on which they might ultimately recover. It is enough that they allege that they were injured and that their allegations can conceivably give rise to a viable claim."). For the reasons set forth below, Annan's factual allegations state viable claims for both First and Fourth Amendment violations, and the Court will allow section 1983 claims premised on both deprivations to proceed accordingly.

A. Warrantless Search and Seizure of Annan's Cellphone

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Subject to certain well-established exceptions, warrantless searches and seizures are per se unreasonable. See Illinois v. MacArthur, 531 U.S. 326, 330 (2001); Riley v. California, 134 S. Ct. 2473, 2482 (2014). In the recent decision Riley v. California, the Supreme Court announced that this principle extends to the examination of a cellphone's contents. 134 S. Ct. at 2495 ("Our answer to the question of what police must do before searching a cell phone . . . is accordingly simple—get a warrant."). Thus, absent exigent circumstances, the police must obtain a warrant to seize a cellphone or to view the device's contents. Id. at 2485, 2493–95.

Here, Annan alleges that the detectives seized his cellphone and perused its contents, apparently without a warrant. (Compl. 13–14; Annan Obj. at 6, 25.) Riley makes clear that, unless an exception to the warrant requirement applies—and none is apparent from the undisputed record—the seizure of Annan's phone and the detectives' subsequent examination of the device's

15

contents without a warrant violates the Fourth Amendment. See 134 S. Ct. at 2485, 2493–95. Annan's complaint thus presents a viable claim that he was deprived of his Fourth Amendment rights when the officers seized and searched his cellphone without a warrant.[5] The Court therefore allows that claim to proceed as so construed. See Phillips, 408 F.3d at 130.

## B. Annan's First Amendment Right to Film the Police

Neither the Supreme Court nor the Second Circuit has yet addressed whether the First Amendment protects a right to record police activity. See Higginbotham v. City of New York, --- F. Supp. 3d. ---, No. 14-CV-859 (PKC) (RLE), 2015 WL 2212242, at *8 (S.D.N.Y. May 12, 2015). Every Court of Appeals faced with the question, however, has concluded that the First Amendment "protects the right to record police officers performing their duties in a public place, subject to reasonable time, place, and manner restrictions." Id. (collecting cases); see Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 608 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995). Courts in this Circuit have followed suit. See Higginbotham, 2015 WL 2212242, at *8 (concluding that the First Amendment protects a right to videotape police officers performing their duties in public subject to reasonable limits).

---

[5] Because Annan alleges that his Fourth Amendment rights were violated, Parratt v. Taylor, 451 U.S. 527 (1981), and Hudson v. Palmer, 468 U.S. 517 (1984), do not foreclose the availability of a section 1983 claim here. Those cases make clear that a property deprivation, whether negligent (Parratt) or intentional (Hudson), does not give rise to a procedural due process claim where adequate post-deprivation remedies are available. For that reason, the Court agrees with Magistrate Judge Pollak that Annan cannot state a procedural due process claim. Parratt and Hudson do not, however, preclude section 1983 plaintiffs from asserting deprivations of substantive constitutional rights, Morello v. James, 810 F.2d 344, 348 ("Intentional, substantive violations of constitutional rights are not subject to the rule of Parratt."), including alleged Fourth Amendment violations. See Gombert v. Lynch, 541 F. Supp. 2d 492, 503–04 (D. Conn. 2008) (rejecting argument that Parratt and Hudson foreclosed section 1983 claim alleging that search and seizure of plaintiff's car and its contents violated the Fourth Amendment); see also Soldal v. Cook Cnty., Ill., 506 U.S. 56, 70 (1992) (reversing Court of Appeals decision holding that a seizure of personal property did not give rise to a Fourth Amendment claim, but instead implicated only the Due Process Clause, noting that "we see no basis for dolling out constitutional protections in such fashion" and concluding, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands").

Annan contends that after he recorded a video of the police beating his companion, the police demanded his cellphone and erased the video. (Compl. at 13–14, 26.) Although the Court reserves decision as to whether such a right exists and whether the conduct at issue infringed such a right, Annan's claim that these events violated his First Amendment rights is neither legally nor factually frivolous. Construing Annan's complaint as raising the strongest arguments it suggests, Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007), the Court therefore allows a section 1983 claim to proceed based on the alleged deprivation of Annan's First Amendment rights.

## CONCLUSION

For the foregoing reasons, the Court adopts the recommendations of the R&R. The Court therefore denies Annan's motions in their entirety and grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants summary judgment on the following claims, which are hereby dismissed: (1) all claims against the NYPD, the Missing Persons Squad, former Mayor Bloomberg, former Commissioner Kelly, and Detective Maldonado; (2) the false imprisonment claim against Officer "Albeck" or "Alback," arising from the January 23–24 incident; (4) the false imprisonment and deprivation of property claims stemming from the May 12 incident; and (5) all state law claims. The Court denies summary judgment as to the frisk claim. That claim will proceed, along with the First and Fourth Amendment claims as construed by the Court, and the January 27 claims, on which defendants did not seek summary judgment.

SO ORDERED.

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge

Dated: Brooklyn, New York
September 18, 2015

17